## CALKINS and others *against* LOCKWOOD and others.

Where the subject of sale was 93 tons of iron, lying by itself; the parties met at the place where the iron was, and agreed upon the price and the mode of payment; they then stepped up to the iron, and the vendor said to the vendee, " I deliver you this iron, at that price;" after which, before the iron was moved, it was claimed and taken away, by a third person; it was held, that this was an actual delivery by the vendor, and a receiving by the vendee; consequently, the contract of sale was valid, under the 2nd section of our statute of frauds and perjuries, corresponding to 29 *Car.* 2. *c.* 3. *s.* 17.

A mere lien on personal property, created by attachment in favour of a trespasser, will not prevent the owner of such property from transferring his title to it.

A written contract was entered into between *A*, the owner of a furnace for the manufacture of iron, and *B*, his lessee, by which *A* stipulated to become the surety of *B*, for the coal, which *B* had purchased, or might purchase, to carry on the manufacture of iron; and *B*, for the purpose of securing *A* for

suretyship, assigned to *A* the stock, iron and other personal property in and about the furnace, and agreed that the coal thereafter to be delivered, should be delivered as the property of *A*, and that *A* should have a lien on all the iron made, or to be made, at the furnace, until such coal should be paid for and *A* indemnified; *A* to have a right, at all times, to controul and direct the sale of the iron, and to apply the avails to his liabilities, and account for the balance. It was also agreed, that *A* should not sell or dispose of the property faster than should be necessary to raise funds to pay his liabilities, from time to time, as they should fall due and payable; but his lien and right to controul said property should continue, and exist at all times, until he should be completely discharged from his liabilities. Held, that by virtue of this contract, *A* was empowered to keep himself in cash funds, by a sale of the iron, ready to meet his responsibilities as they should mature, and was not restricted, in the sale, to the amount of those only which had then matured.

*A* having sold, under such contract, a parcel of iron to *C*, which was taken by *D*, as the property of his debtor *B*; in a suit brought by *C* against *D*, for such taking, the defence was fraudulent conduct in *A* and *B*. *D* prayed the court to instruct the jury, that if *A* kept the contract a secret, and *B* was suffered to hold himself out as the owner of the iron, the sale from *A* to *C* was void in law. The instruction given to the jury, was, that if, for the purpose of giving *B* a false credit, it was a part of the original design to keep the contract a secret, or if *A* suffered *B* to hold himself out, or if *A* held him out, to the world, as the owner of the proper.y, with such corrupt intent, the contract was void, as against *B's* creditors. After a verdict for the plaintiff, it was held, that the defendant had no reason to complain of the charge; for the contract left *B* in the management and ostensible ownership of the iron, subject to *A's* right to take possession of it and dispose of it; and *A* was not obliged, as a volunteer, to make public the existence or the character of his claim.

Where it appeared, that *B* had sold a distinct parcel of the iron made under such contract, to a stranger, which the vendee suffered to remain in *B's* possession, as before the sale; after which it was claimed by *A*, under the contract; but, for some reason, *A* attached it, in a suit against *B*; this attachment, however, was soon abandoned, and *A* resorted again to his claim under the contract; it was held, that the rights of *A* under the contract were not affected by such sale, by reason of the continued possession of the vendee; nor by such attachment, as a creditor may resort to all the means of security which the law has placed within his reach. [One judge dissenting]

The removal and retention of the personal property of a stranger, by an officer acting by direction of the party, is a conversion by both, aside from any demand and refusal.

A new trial having been granted, pursuant to the opinion of this court, (16 *Conn. R.* 276–291.) the cause was tried again, at *Litchfield, February* term, 1845, before *Hinman*, J.

On the 27th of *November*, 1840, *Barnabas Payne* leased to *Nathaniel E. Bradley* about six acres of land in *Sharon Valley*, with a furnace for the manufacture of iron, and a dwelling-house and store thereon, from the 1st of *April*,

*Litchfield,*
June, 1845.

Calkins
*v.*
Lockwood.

1841, to the 1st of *April,* 1844.   On the 17th of *March,* 1841, an additional agreement, between the same parties, was entered into, in relation to the rent.   *Bradley,* by virtue of said lease, entered into possession of the premises therein specified, and continued in possession thereof until the 16th of *February,* 1843.   On the 5th of that month, he left the state, as was supposed, to find a market for his iron ; but he has never since returned, and he in fact absconded, at that time.

On the 4th of *January,* 1842, a contract was entered into between *Payne* and *Bradley,* a copy of which appears in 16 *Conn. R.* 277, 8.   The plaintiffs admitted, that *Bradley* had paid *Jeremiah Calkins,* named in that contract and one of the plaintiffs, for the coal delivered by him before the execution of the contract ; but to show the liabilities of *Payne* under it, they read in evidence a contract entered into between *Bradley* and *Calkins,* on the 24th of *February,* 1842, and the guaranty thereof by *Payne* endorsed thereon ; under which, *Calkins,* before the 3rd of *January,* 1843, delivered to *Bradley,* on the premises above-mentioned, 28,416 bushels of coal, for which *Bradley* became indebted to *Calkins.* The amount of such indebtedness, on the 16th of *February,* 1843, was 1,837 dollars ; for which *Payne* was liable, by virtue of his guaranty.   The plaintiffs also read in evidence, for the same purpose, a contract entered into between *Bradley* and *Henry Bird* and *Charles Kilmer,* two of the plaintiffs, dated the 4th of *January,* 1842, which was also guarantied by *Payne.*   Under this contract, *Bird* and *Kilmer,* before the 9th of *January,* 1843, delivered to *Bradley,* on the same premises, 34,908 bushels of coal, for which he became indebted to them, and *Payne* became liable, by virtue of his guaranty.   For the amount of such indebtedness *Bradley* and *Payne* gave their promissory notes.

The plaintiffs claimed to have proved, that on the 16th of *February,* 1843, *Payne* went to the furnace premises, then in the occupation of *Bradley,* and in the presence of witnesses, took possession, under his contract with *Bradley* of the 4th of *January,* 1842, of two parcels of pig iron, lying near the furnace door, one containing 10 tons, called No. 1. iron, and the other about 95 tons, called No. 2. iron, and commenced the removal of said iron, employing several persons to assist

him in such removal; that it was completed as soon as it could conveniently be done, on the same day and the succeeding evening, the iron being deposited in the high-way adjoining the premises of *Aaron Reed;* that on the next day, *Payne, Calkins, Bird,* and *Kilmer* met in the high-way near said iron, and agreed, that the plaintiffs should purchase and receive the iron of *Payne,* at the rate of 26 dollars a ton, to be applied on his guaranties; and that, in pursuance of this agreement, the iron was then delivered by *Payne* to the plaintiffs, and received by them, to be so applied.

The witnesses to the point of delivery, stated, that immediately after the terms of the agreement had been concluded, *Payne* and the plaintiffs stepped up to the iron, and *Payne* said to the plaintiffs, " I deliver this iron to you, at that price," or words to that effect; that then *Lockwood,* one of the defendants, came up, and said, that he claimed the iron, and addressing the parties, added " Stand away," or words to that effect; that then the attorney of the plaintiffs, in their behalf, demanded the iron of *Lockwood;* and that *Lockwood* replied to the demand, that he should not give it up. There was no further evidence of the delivery of the iron to the plaintiffs, or of the acceptance of it by them.

It was proved and admitted, that the defendant *Lockwood,* claiming to hold the iron by virtue of several writs of attachment against *Bradley,* previously levied by him as a deputy-sheriff, a few days after the 17th of *February* 1843, removed said iron from the highway, where it was put on the 16th of *February,* and where it had hitherto remained.

The defendants claimed to have proved, that *Bradley* run the furnace mentioned in said lease, during two blasts, commencing in midsummer, and terminating, the first about the 1st of *February,* 1842, and the second, about the same time in 1843; that in prosecuting this business, *Bradley,* from time to time, purchased on credit large quantities of coal, iron-ore and other materials used in the manufacture of iron at the furnace, and employed a large number of agents and hands in making the iron, and in transporting the ore and coal used in such manufacture; that *Bradley,* at all times after he entered upon the premises under said lease, and particularly, after the 4th of *January* 1842, carried on said business at the furnace, in his own name, with the knowledge of

*Payne*, as being solely interested in the business, and the exclusive owner of all the property in and about the furnace, and of all the coal and other materials delivered there, and of all the iron manufactured there, with the right to dispose thereof as he might see fit; that by so carrying on said business, he obtained large and extensive credits, particularly between the 4th of *January*, 1842, and the 16th of *February* 1843, and became indebted, during that period, for coal delivered at the furnace, to divers of the attaching creditors above referred to, and other persons; and that those creditors, and others who had dealings with him, and to whom he became indebted, during that period, trusted him on the credit of said business and property, in the confident belief that he was the sole and absolute owner thereof.

The defendants claimed, that when said contract of the 4th of *January*, 1842, was entered into, it was understood and agreed by the parties, that it should be kept secret, and that they accordingly did keep it secret, until *Payne* disclosed its existence, on the 16th of *February*, in the manner above stated. To show the secresy practiced by *Payne* and *Bradley* in respect to said contract, the defendants offered sundry witnesses to prove, in connexion with the other facts claimed by them to be true, that they, the witnesses, from the 4th of *January*, 1842, to the 16th of *February*, 1843, had respectively dealings with *Bradley*, at the furnace, and were in the habit of daily intercourse with him, and often saw *Payne* there, and yet they had no knowledge of the existence of said contract, until after the taking of the iron by *Payne*, on the 16th of *February*; and that it was not publicly known until that time. To this evidence the plaintiffs objected, and the court excluded it.

The defendants also offered evidence to prove, and claimed they had proved, that the stock, iron and personal property, which *Bradley* had on or about the furnace premises, at the execution of the contract of the 4th of *January* 1842, and the iron which he made at the furnace, and the coal, ore, and other materials for the manufacture of iron, which he had on the furnace premises, constituted all his property, and all the means which he had to pay the debts contracted by him in said business, or otherwise; and that he, being indebted to *Richard Clark* in the sum of 300 dollars, on book, for board-

ing workmen in said business, sold to *Clark*, on or about the 1st of *February* 1843, in payment of such debt, said 10 tons of No. 1. iron, claimed to have been taken by *Payne*, which, as the defendants claimed, was separated, by *Bradley* and *Clark*, from other iron belonging to *Bradley*, and delivered to *Clark*, and placed on the premises in a pile by itself, where it was lying, when taken by *Payne*, on the 16th of *February*, as claimed by the plaintiffs.

*Litchfield,*
June, 1845.

Calkins
*v.*
Lockwood.

The defendants then claimed to have proved, that *Payne*, after said pretended taking of the iron by him, and in the course of the same day, put into the hands of *Lockwood*, then a deputy-sheriff, a writ of attachment against *Bradley*, in a suit on his covenants in said lease, by virtue of which *Lockwood* attached both the piles of iron, called No. 1. and No. 2.; immediately after which, certain other creditors of *Bradley* caused sundry writs of attachment, in their favour against *Bradley*, to be levied on the whole of said iron, subject to *Payne's* attachment; and that, by virtue of *Payne's* writ and the writs of the other creditors, the officer, with the knowledge and consent of *Payne*, took into his possession the whole of said iron, and removed it off from the premises into the highway, adjoining the land of said *Reed ;* and that the removal of said iron, claimed by the plaintiffs to have been made by *Payne*, was in fact made by said officer, under and by virtue of said attachments; that *Payne* soon afterwards, (and before the sale to the plaintiffs on the 17th of *February*, as now claimed by them,) directed the officer to release said iron from his attachment, which was accordingly done; and thenceforth, the officer held said iron under the attachments of the other creditors only.

The defendants also claimed to have proved, that said iron claimed to have been taken by *Payne* under the contract of the 4th of *January*, 1842, was manufactured during the last run of the furnace, and was mostly made during the month of *January*, 1843, and all of it, more than one fortnight before said pretended taking of *Payne* under said contract; and that *Bradley* had been, at all times, after said iron was made until said taking on the 16th of *February*, openly in the possession of said iron, and for many months before said taking, had been openly in the possession of the furnace, and of all the materials, and in the making of the iron in

dispute, and of all other iron manufactured at the furnace; and that when the attachments of said creditors were levied on the iron in dispute, all except two or three tons of it, which had previously been removed, was on the premises occupied by *Bradley,* visibly in the same condition it was in before the pretended taking by *Payne* under said contract, except that some men and teams were then employed in removing it, under the direction of the agent and attorney of the attaching creditors; that before the levy of these attachments, the agent and attorney of the creditors, having no knowledge of the contract of the 4th of *January,* 1842, nor of said taking by *Payne* under it, enquired of him as to the amount of his claim against *Bradley* under his attachment, which he then stated to be six or eight thousand dollars; that he stood by, both before and during the levy of said attachments, and during the removal of said iron by the officer, under those attachments, and did not make known to the defendants, nor the other attaching creditors, nor to their attorney, either the contract of the 4th of *January,* 1842, nor his taking of the iron under it, on the morning of the 16th of *February,* as claimed by the plaintiffs; and that the defendants, and other attaching creditors, and their attorney, had no knowledge of either, till some time during the next day.

The defendants requested the court to instruct the jury, that if they should find it was the original intention of *Payne* and *Bradley* in entering into said contract, that *Bradley* should remain in possession of the property therein comprised, and exhibit himself to the world as the absolute owner thereof; or if the jury should find, that it was understood by and between *Payne* and *Bradley,* at the execution of said contract, that it should be kept secret, so that *Bradley* might obtain credit, in and by said business and property; in either case, said contract would be fraudulent and void against the creditors of *Bradley.*

They also requested the court to instruct the jury, that if there was no such original purpose, yet if the jury should find, that *Payne* did in fact keep the contract secret, under the circumstances claimed by the defendants; or if *Payne* suffered *Bradley* to hold himself out to the world as being the absolute owner of all the property from time to time at

the furnace, and particularly of the iron in dispute, and of the materials used in making it; or if *Payne* himself held out *Bradley* as being such owner; then, in either case, such contract would be void against *Bradley's* creditors.

The defendants also requested the court to instruct the jury, that if they should find, that *Payne* did in fact keep said contract secret, during the period claimed by the defendants; particularly, if they should find, that *Bradley* transacted said business at the furnace, in the manner claimed by the defendants; then such secrecy would be evidence, that said contract was fraudulent. And also, if they should find, that the property belonging to *Bradley*, in and about the furnace, at the execution of said contract, and the coal and other materials for making iron delivered at the furnace, and the iron made thereat from the execution of said contract until the taking by *Payne* of the iron in dispute, on the 16th of *February*, constituted all the property of *Bradley*, and all his means of paying his debts; then such fact would be evidence of fraud in said contract; and especially would it be so, if the jury, in addition to this fact, should find, that said property was of the amount and value claimed by the defendants, and that *Bradley* transacted said business at the furnace, in the manner claimed by them.

The defendants also requested the court to instruct the jury, that if they should find that *Payne* suffered *Bradley*, from and after the execution of said contract, to retain possession of all " such stock, iron and personal property," as was in and about the furnace, when said contract was executed, and to dispose thereof; then such fact would be evidence of fraud in such contract. Also, that if *Payne* did, at all times after said contract was entered into, suffer *Bradley* to receive, in his own name, and as his own property, all the coal delivered at the furnace, from and after the 4th day of *January* to the 16th *February*, such fact would be further evidence of fraud in said contract. Also, if *Payne* did, at all times after the same date, permit *Bradley* to possess, and to dispose of, in his own name, and for his own use, all the iron made at the furnace, during said period, (except the iron in dispute,) and all other personal property which he had on said premises, during said period; then such possession and disposition would be further evidence of fraud in said

*Litchfield,*
June, 1845.

Calkins
*v.*
Lockwood.

contract. And finally, that if *Payne* suffered *Bradley* to have possession of the iron in dispute, and of the materials used in making it, in the manner claimed by the defendants; then such possession is evidence of fraud in said contract, as against creditors, and, in this case, conclusive evidence, inasmuch as the plaintiffs have not shown to the court any reason which the law deems sufficient, to justify such possession.

The defendants also requested the court to instruct the jury, that if they should find that *Bradley* did said business at the furnace, in the manner claimed by the defendants, and possessed and disposed of all the iron, and all the coal on the furnace premises, and the other materials used in making iron in and about the furnace, from the 4th day of *January* to said 16th day of *February*, as claimed by the defendants; and if he had in his sole possession the iron in dispute, and the materials used in making it, in the manner, and for and during the period, claimed by the defendants; and if they should also find, that the same iron, up to the time of its attachment by *Lockwood*, remained visibly in the possession of *Bradley*, or on his premises, in the same condition it was in before the supposed taking by *Payne* under his contract; and also, that the attachments of said creditors of *Bradley*, were levied by them, in ignorance of the rights of *Payne*, as now set up under said contract; and also, that *Payne* stood by, during the levy of such attachments, and knowing thereof, did not make known to the officer, nor to the attaching creditors, nor to their attorney, either the existence of said contract, or his taking of said iron under it, as now claimed, on the 16th of *February;* then and in such case, the attaching creditors can hold the iron, notwithstanding such contract, and the pretended taking of *Payne* under it.

The defendants also requested the court to instruct the jury, that if they should find the facts and circumstances last above specified to be proved and true; then the defendants, excepting said *Lockwood*, are not liable to the plaintiffs, inasmuch as it does not appear, that such defendants had notice of the plaintiffs' title before said suit was instituted; nor that they were required to deliver said iron to the plaintiffs; and that, under such facts and circumstances, (if found by the jury,) none of the defendants are liable to these plaintiffs, in-

asmuch as *Payne* could not create a title to the iron in the plaintiffs, in opposition to said attachments, and in opposition to an officer who had taken said iron in discharge of his duty; and that the defendants, under such circumstances, were not obliged to take notice of the plaintiffs' title, or to deliver said iron to the plaintiffs; and therefore, the neglect or refusal of *Lockwood* to deliver said iron to the plaintiffs, when demanded, was not a conversion.

They also requested the court to instruct the jury, that if they should find, that before said pretended sale to the plaintiffs, the defendants had taken said iron out of the possession of *Payne*, so as to become liable to him in trespass or trover, he could not, while said iron was wrongfully holden by the defendants, sell it to the plaintiffs; and that, upon a title thus acquired, the plaintiffs could not recover. And if, in addition to these facts, the jury should find, that the parties to the pretended sale, merely agreed, that the plaintiffs should have said iron at 26 dollars *per* ton, to be applied on the claims as proved; and that *Payne* used said words about the delivery of said iron, as claimed by the plaintiffs, and then the parties separated, without doing any thing more; the transaction would not, in point of law, be a sale: that a verbal agreement that the price of the iron should be applied on said claims, would not be payment: that such words would not be a delivery of said iron, if it was then adversely in the hands of *Lockwood*, as claimed by the defendants: that *Payne* had no right, by the terms of the contract, to sell said iron to the plaintiffs, in the manner he did: that the contract of *Jeremiah Calkins* was not specifically comprised in the contract of the 4th of *January*, 1842, and that the general clause in said contract providing for the indemnity of *Payne* against the liabilities he might thereafter assume, was void, as against creditors: and that the notes executed by *Bradley* and *Payne* to *Bird* and *Kilmer*, was an extension of credit, in such manner that *Payne* had no right to sell, even under said contract, until such notes fell due.

In respect to the facts so claimed to be proved by the defendants, the plaintiffs denied their truth, and claimed, that there was no evidence worthy of credit before the jury, in support of the claims of the defendants; and especially, that the only evidence tending to impute fraud to *Payne* was

*Litchfield,*
June, 1845.

Calkins
*v.*
Lockwood.

derived from a witness whom the plaintiffs introduced evidence to impeach, and who, as the plaintiffs claimed, was wholly unworthy of credit. And the plaintiffs introduced evidence tending to prove, and claimed they had proved, that the debts guarantied by *Payne*, were *bona fide* debts ; that said guaranties were made in good faith ; and that the contract of the 4th of *January*, 1842, was made for the purpose of securing an honest liability, in an honest manner, and for no other purpose.

And the plaintiffs claimed, that said iron was manufactured during the last run of the furnace ; that the furnace made about four tons a day, and that it blew out about a fortnight before it was taken possession of by *Payne ;* and that he had taken possession thereof, and had removed several loads, and was in the act of removing the residue, when said attachments were levied thereon.

The plaintiffs further claimed, and offered evidence to show, that the contract of the 4th of *January*, 1842, did not embrace all, nor the principal part, of the property of *Bradley ;* and that the security was no more than reasonable and adequate to the demands thereby secured. The evidence to show that *Bradley* had other property than that embraced in the furnace establishment, consisted in the declaration of *Bradley* to the defendants' witnesses, which came out on the cross-examination, and the testimony of *Mills S. Wheeler*, who stated, that in consequence of what *Bradley* told him, he went to *New-York*, and found by the records and by reputation, that *Bradley* owned a furnace-stand in *Orange* county, *N. Y.*, and that he had a claim on some property in *Haverstraw*, on which there appeared to be due him about 5,000 dollars.

The plaintiffs also claimed, that on no occasion had *Payne* done, or suffered any thing to be done, to induce credit to be given to *Bradley ;* and that, on the only occasion on which it was claimed, he ever spoke concerning the credit of *Bradley, viz.* in the conversation above referred to with *Mills S. Wheeler*, the answer of *Payne* to *Wheeler* discouraged, and was calculated to discourage, *Wheeler* from giving credit to *Bradley ;* and that *Wheeler* stated in his testimony, that he did not in fact give *Bradley* credit, in consequence of what *Payne* said to him.

*Litchfield,*
June, 1845.

Calkins
*v.*
Lockwood.

As to the pile of No. 1. iron, the plaintiffs claimed, and offered evidence to prove, that after the pretended sale thereof to *Clark*, it was suffered by him to remain on the premises of *Bradley*, and in his possession, and in the same visible situation as before such pretended sale, though a reasonable time had been allowed for its removal ; and that *Payne* took possession thereof under his contract, while it was so in the possession of *Bradley ; Payne* being entirely ignorant of any pretended claim thereto by *Clark.*

The plaintiffs claimed, and offered evidence to prove, that after *Payne* had taken possession of the pile of No. 1. iron, a controversy arose between him and said *Clark*, in relation thereto ; and that in order to put an end to that controversy, *Payne* directed *Lockwood* to attach said pile of No. 1. iron, on the attachment in his favour above-mentioned against *Bradley ;* and that *Payne* did not direct *Lockwood* to attach the pile of No. 2. iron ; and that *Lockwood* did not in fact attach any other than said pile of No. 1. iron on *Payne's* attachment ; and that *that* was shortly after released from such attachment : that *Lockwood*, when he served the attachments of said other creditors, did not attempt to take possession of said iron, but levied thereon expressly subject to the rights of *Payne*, and held it subject to his rights, until after the sale to the plaintiffs, and until the demand made upon him by the attorney of the plaintiffs, and that after such demand, *Lockwood* held such iron adversely to *Payne* and the plaintiffs ; and that, in a few days after said demand, *Lockwood* removed and converted the iron : that *Payne* took open possession, in the presence of witnesses, of the iron, under his said contract, on the morning of the 16th of *February*, and was publicly engaged in removing the iron, by persons to whom he had communicated his right and title to take it under said contract.

The plaintiffs did not claim, that *Payne* would have any right to the iron in dispute, or that they could derive any title thereto from him, as against the attaching creditors of *Bradley*, unless it was proved, that *Payne* had taken possession of the iron before the attachments were served. The plaintiffs also admitted, that if the intention of *Payne* and *Bradley* in entering into said contract, was, to defraud the creditors of *Bradley*, or to give him a false credit ; and if the jury should

*Litchfield,*
*June, 1845.*

*Calkins*
*v.*
*Lockwood.*

find, that there was an agreement or understanding that the contract should be kept secret; or if it was in fact kept secret, with any such intention, the contract was illegal and void; that if in fact the defendants were drawn in to attach the iron, by the concealment or abandonment by *Payne* of his right under said contract, that then the plaintiffs ought not to recover; that delivery of the iron to the plaintiffs by *Payne*, was necessary to make the sale to them valid, which delivery they claimed to the jury was sufficiently proved; that *Payne* could not sell more than enough to pay such an amount of the guarantied debts as had fallen due, at the time of sale; but they claimed, that under the contract, he had a right to take and keep possession, to indemnify him; and that being in possession of the iron for that purpose, and as the liabilities guarantied by him were to these plaintiffs, and as the iron was held as surety for the debts of these plaintiffs, it was rightfully in their possession, to secure their entire demands; and they therefore claimed to recover for it of the defendants.

The court charged the jury, that if a vendor of personal property is suffered to retain the possession of the property after it is sold, the sale is void, against subsequent attaching creditors and *bona fide* purchasers of the vendor; being presumed to be fraudulent, unless some sufficient reason satisfactory to the court is shown for such retention of possession; that this law applied to the 10 tons of iron, purchased by *Richard Clark* of *Bradley*, and put in a pile by itself, and suffered to remain in the possession of *Bradley* at the furnace; that as no reason was shown for its being so suffered to remain in *Bradley's* possession, it was, while in this condition, liable to be attached, by the creditors of *Bradley*, and to be taken by *Payne*, by virtue of his contract; but that this lien, under the circumstances of this case, had but a remote bearing upon the other parts of the case; that the contract under which *Payne* and the plaintiffs claimed, that *Payne* had the right to take possession of the iron in dispute, was a valid contract, upon the face of it; and that unless it was infected with fraud in fact, it was to be carried into effect according to the intent of the parties in making it; but if it was made to conceal the property from *Bradley's* creditors; or if it was made use of, by the parties, for any such

*Litchfield,*
June, 1845.

Calkins
*v.*
Lockwood.

purpose ; or if there was a design to make it appear, that the property was *Bradley's,* that he might obtain credit thereby, and then that *Payne* might come in and sweep off the property from *Bradley's* creditors, it was void ; and if, as a means of accomplishing any of these objects, it was part of the design to keep the existence of the contract secret ; or if *Payne* permitted *Bradley* to hold himself out to the world as owner of the property, when in fact he was not ; or if he held out *Bradley* as owner, when he was not, with any such corrupt intent ; then the contract would be void, and the plaintiffs could not recover ; or if, subsequent to his taking possession of the property, *Payne* held out *Bradley* as the owner of it, or in any way intentionally drew in the creditors of *Bradley* to attach the property, he claiming no interest under the contract, and by any such means the creditors were induced to attach the property, this would be such fraud as would estop *Payne* from setting up title under the contract, and would operate as an abandonment of his rights under it, and prevent a recovery by the plaintiffs.

But the court instructed the jury, that if there was no fraud in the original concoction of the contract, nor in the management of the parties under it, then the case would, in a great measure, depend upon what took place between *Payne* and these parties on the 16th and 17th days of *February,* 1843 : that if *Payne* took possession of the iron, in the manner claimed by the plaintiffs, on the 16th of *February,* before it was attached by any body, he would be entitled to a reasonable time to remove it ; and that it was for the jury to say, whether he was guilty of any unreasonable delay in moving it. And the court expressed the opinion, that if, as the plaintiffs claimed the fact to be, he began to move it immediately, and employed two or three teams and several men to assist in the removal, there was no very unreasonable delay in removing the iron.

In regard to the contract of *Payne,* when the attachments under which the defendants claimed were served, the court instructed the jury, that if *Payne,* by his conduct, in any way intentionally drew in the defendants to serve their attachments, he, at the time, claiming no interest under his contract, by means of which the defendants were induced to attach, this would prevent *Payne* from setting up title under the con-

HARVARD LAW LIBRARY

tract, and prevent a recovery by the plaintiffs; but that an attachment by *Payne* of the same iron, to secure another and different debt than that attempted to be secured by the contract under which he claimed the right to take the property, would not be an abandonment of any right he might have under that contract.

The court also charged the jury, that the plaintiffs, to recover, must prove, that they had either the absolute or a qualified title to the iron in dispute, and also the right to the immediate possession of it; but that a qualified title derived from *Payne*, with the right to the possession of it, was sufficient to entitle them to recover the full value of it; and that whether they had such right derived from *Payne*, depended in part upon the delivery to them claimed to have taken place on the 17th of *February*, at the time of the sale claimed to to have been made to the plaintiffs. In regard to such sale, the court instructed the jury, that situated as the property was, it was not necessary that the plaintiffs should have removed it, on the 17th, in order to perfect the delivery to them; but that it was sufficient, if the possession was in fact delivered, in the manner claimed by the plaintiffs, and received by them.

The jury returned a verdict for the plaintiffs; and the defendants thereupon moved for a new trial, on the ground that the court erred in excluding the evidence offered by them, as well as in the charge to the jury, and in the omission to charge them as requested by the defendants.

*Ellsworth* and *T. Smith*, in support of the motion, contended, 1. That the plaintiffs had no such title to the iron in question, derived from *Payne*, as would support this action. In the first place, it is to be kept in mind, that to sustain trover, the plaintiff must have both the right of property and the right of possession. *Bloxam* v. *Sanders*, 4 *B. & Cres.* 941. (10 *E. C. L.* 477.) *Gordon* v. *Harper*, 7 *Term R.* 9. 12. Secondly, the case is within the statute of frauds and perjuries; as the plaintiffs did not accept and actually receive part of the iron, or give any thing in earnest, &c. *Stat.* 299, 300. (ed. 1838.) The language of the statute—"*actually received*"—is very strong, and shows that there must be a manual tradition—a handing over—of one party, and a ta-

king of possession by the other. A *symbolical* or *virtual* delivery is good, where, from the nature of the case, no other can be made ; because this gives the controul of the property—the dominion over it. But here, there was no delivery of any sort. The iron was not moved ; its weight was not ascertained ; there was no symbolical or virtual delivery ; nor was it a proper case for such a delivery. *Bailey* & al. v. *Ogden*, 3 *Johns. R.* 399. *Maberly* v. *Sheppard*, 10 *Bing.* 99. (25 *E. C. L.* 43.) *Baldley* v. *Parker*, 2 *B.* & *Cres.* 37. (9 *E. C. L.* 16.) *Edan* v. *Dudfield*, 1 *Ad.* & *El. N. S.* 551. (41 *E. C. L.* 551.) *Nicholle* v. *Plume*, 1 *Car.* & *Pa.* 272. (11 *E. C. L.* 390.) *Holl* v. *Griffin*, 10 *Bing.* 246. (25 *E. C. L.* 118.) *Acebal* v. *Levy*, 10 *Bing.* 376. (25 *E. C. L.* 170.) *Blenkinsop* v. *Clayton*, 7 *Taun.* 597. *Elmore* v. *Stone*, 1 *Taun.* 458. *Astey* v. *Emery*, 4 *Mau.* & *Sel.* 262. *Bentall* v. *Burn*, 3 *B.* & *Cres.* 423. (10 *E. C. L.* 138.) *Alexander* v. *Comber*, 1 *H. Bla.* 20. *Hanson* v. *Meyer*, 6 *East*, 614. *Calkins* v. *Lockwood*, 16 *Conn. R.* 287. Thirdly, if the property was adversely in the possession of *Lockwood*, *Payne* could not sell to the plaintiffs, so as to invest them with a title as against these defendants. *Imlay* v. *Sage*, 5 *Conn. R.* 489. *Morehouse* v. *Canfield*, *Sup. Ct. Litchfield Co. Aug.* 1834, *cor. Daggett*, J. Fourthly, *Payne* had no right to sell, as he did, to the plaintiffs, by reason of the provisions of his contract with *Bradley*. *Pettibone* v. *Griswold*, 4 *Conn. R.* 158. *Shepard* v. *Shepard*, 6 *Conn. R.* 37. *Sanford* v. *Wheeler*, 13 *Conn. R.* 165. *North* v. *Belden.* Id. 376. *Hart* v. *Chalker*, 14 *Conn. R.* 77. *Calkins* v. *Lockwood*, 16 *Conn. R.* 288.

2. That the refusal of *Lockwood* was not a refusal by the other defendants. *Meredith* v. *Flaxman*, 5 *Car.* & *Pa.* 99. (24 *E. C. L.* 231.) *Sarjeant* v. *Cowan*, Id. 492. (24 *E. C. L.* 423.) *Nicoll* v. *Glennie*, 1 *Mau.* & *Sel.* 588. *McCombie* v. *Davies*, 6 *East*, 538. *Bristol* v. *Burt*, 7 *Johns. R.* 254. *Rushworth* v. *Taylor*, 3 *Ad.* & *El. N. S.* 699. (43 *E. C. L.* 932.) *Alexander* v. *Southey*, 5 *B.* & *Ald.* 247. (7 *E. C. L.* 85.) *Smith* v. *Young*, 1 *Campb.* 439. *Hayward* v. *Seaward*, 1 *M.* & *Sc.* 459. (28 *E. C. L.* 269.) *Timothy* v. *Simpson*, 6 *Car.* & *Pa.* 499. (25 *E. C. L.* 510.) *Barnard* v. *How*, 1 *Car.* & *Pa.* 366. (11 *E. C. L.* 422.) *Colegrave* v. *Dias San-*

*tos,* 2 *B.* & *Cres.* 76. (9 *E. C. L.* 30.)   *Leonard* v. *Tidd,* 3 *Metc.* 6.

3. That in regard to the No. 1. iron, *Payne* was not in a situation to defeat the title of *Richard Clark*, by purchase from *Bradley.* The right of *Clark* was the superior and better right; and therefore, the charge on this point was wrong. *Rob. Fraud. Con.* 388.

4. That the possession of *Bradley*, under the circumstances claimed by the defendants, was conclusive on the point of fraud, notwithstanding the seizure of *Payne.* At any rate, it was evidence of fraud, and as such, should have been submitted to the jury. The various badges of fraud insisted on by the defendants, should also have been submitted, as further evidence on the same point. *Osborne* v. *Tuller,* 14 *Conn. R.* 529. *Carter* v. *Watkins, Id.* 240. *Mills* v. *Camp, Id.* 219. *Swift* v. *Thompson,* 9 *Conn. R.* 63. *Robins* v. *Parker,* 3 *Metc.* 117. *Twyne's case,* 3 *Co.* 80. *Calkins* v. *Lockwood,* 16 *Conn. R.* 288. 1 *Sw. Dig.* 274. *Leonard* v. *Baker,* 1 *Mau.* & *Sel.* 250. *Shurtleff* v. *Willard,* 19 *Pick.* 202. 211. *Jones* v. *Huggeford,* 3 *Metc.* 515.

5. That the rejection of the evidence offered by the defendants to prove secrecy, was erroneous. 1 *Sw. Dig.* 274. *Leonard.* v. *Baker,* 1 *Mau.* & *Sel.* 250. *Twyne's case,* 3 *Co.* 80.

6. That *Payne* cannot avail himself of his seizure of the iron, because he stood by, during the attachment and removal thereof by the defendants, and disclosed neither his contract with *Bradley*, nor his seizure under that contract.

7. That the charge of the judge on the title of *Clark* to the No. 1. iron, on the point of fraud, on the secrecy practiced by *Payne*, on the conduct of *Payne* when the defendants' attachment was levied, and on the title of the plaintiffs as derived from *Payne*, was erroneous.

8. That the judge should have submitted the entire case, as claimed by the defendants, to the jury, with instructions in conformity with the request of the defendants.

*Church* and *Seymour*, contra, remarked, *in limine*, That the rights of the plaintiffs, in this case, depend mainly upon the contract between *Payne* and *Bradley* of the 4th of *January*, 1842; the validity of which this court, one year ago,

*Litchfield,*
June, 1845.

Calkins
*v.*
Lockwood.

established, and decided that *Payne* might lawfully secure himself thereby, in the manner in which he attempted to do. 16 *Conn. R.* 276. The defence, now, is not, that the debts and liabilities assumed by *Payne*, are not real and *bona fide* ; nor that when *Payne* seized the iron and took it into his possession, he seized it as a mere sham for *Bradley's* benefit ; nor that, upon the seizure, he held the iron for any other purpose than as security for *bona fide* liabilities. But the defence is, that *Bradley* continued in possession of property, which *Payne* might have taken possession of, under the contract, as absolute owner ; that he got credit on it, as such owner ; that *Payne* knew this ; that he concealed the contract, in pursuance of an original understanding between him and *Bradley* that it should be kept secret ; and that, in connexion with these facts, there was testimony offered by the defendants to prove, that the witnesses *did not know* the existence of the contract. The defence proceeds upon the idea, that some inference can be drawn against *Payne's* title, because he did not exercise his rights under the contract. The counsel for the plaintiffs, then contended,

1. That no inference ought to be made against *Payne*, because he deferred taking possession of the property. His right to take possession, was indeed immediate, but his power to sell was deferred until pay-day ; and it was perfectly natural that he should wait until pay-day, before taking possession, in order to see if *Bradley* himself might not pay, and avoid the necessity of *Payne's* troubling himself at all with the matter. *Bradley* met these engagements himself until *February*, 1843. Of course, *Payne* had no occasion to make a seizure until that time. Until possession taken, *Bradley* must necessarily appear as the owner, because he *was* then the owner, with full power to sell. *Bradley's* appearing as owner, under such circumstances, was no evidence of fraud ; nor could it impair the rights of *Payne* under the contract. *Seymour* v. *Hoadley,* 9 *Conn. R.* 418.

2. That the testimony offered by the defendants, to show the secrecy of the contract between *Payne* and *Bradley*, was properly rejected. Here it should be noticed, that proof of the *concealment* of the contract, and of its being *kept secret*, had been offered and received without objection. The defendants then proposed to show, that certain persons about

*Litchfield,*
*June, 1845.*

*Calkins*
*v.*
*Lockwood.*

the furnace *did not know* of the contract. This, at most, went to show, that its existence was *not made known*; but not, that *Payne* and *Bradley*, or either of them, *did any thing* to conceal it. But the *mere silence* of a man about his business, (unless under peculiar circumstances where it is his duty to speak,) affords no inference against him. A man's private business, is, of course, of a private nature. At any rate, the plaintiffs are under no responsibility for *Bradley's* silence. *Mills* v. *Camp*, 14 *Conn. R.* 228. *West* v. *Anderson*, 9 *Conn. R.* 107.

3. That the charge in relation to the secrecy of the contract and *Bradley's* manner of conducting his business, was unexceptionable. The defendants called upon the judge to instruct the jury, that the mere *keeping of secrecy*, under the circumstances of the case, would render the contract fraudulent. The defendants admitted, that if the contract was kept secret, with intent to defraud *Bradley's* creditors, or to give *Bradley* a false credit, this would make the contract void; and this question of fact was submitted.

4. That the defendants, under the charge, had the benefit of the other circumstances relied upon as evidence of fraud.

5. That the sale of the iron by *Payne* to the plaintiffs, was a valid sale, being accompanied with actual delivery.

6. That the fact that the iron, at the time of the sale to the plaintiffs, was subject to the pretended attachments of some of *Bradley's* creditors, did not invalidate such sale, as those creditors, in attaching such property, were trespassers. The law against selling pretended titles, is not applicable to such a case.

7. That the sale of the No. 1. iron to *Clark*, not being accompanied by a change of possession, was constructively fraudulent and void, as against the claims of *Payne* under the contract.

8. That *Payne's* attachment of this iron, which he soon abandoned, had no effect upon his rights under the contract.

9. That the conversion in this case, was an actual conversion; and as *Lockwood* acted by direction of the other defendants, they all participated in it. No demand was necessary.

CHURCH, J. When this case came under our consideration before, (16 *Conn. R.* 276.) we held, that the contract be-

tween *Bradley* and *Payne*, dated the 4th of *January*, 1842, was not fraudulent in law, nor void as being opposed to the policy of the law. We held also, that the time and circumstances under which possession of the iron in dispute was taken, as well as the other objections made by the defendants on that trial, many of which have been repeated on this, were very proper to be taken into consideration by the jury, when determining whether this contract was in fact fraudulent or not.

Most of the objections to the course of the last trial to the jury, and which are detailed with much circumstantial precision on this motion, seem as if intended to induce us to retract the opinion formerly given, or to persuade us to believe, that the verdict last rendered was opposed to the weight of the evidence on the point of fraud.

Various circumstances are recited as badges of fraud, which were undoubtedly such, but which we have now no leisure to enumerate. The great issue between the parties, at the trial, was, whether the contract of the 4th of *January*, 1842, was fraudulent in fact ; and to prove the fraud, the circumstances alluded to were offered in evidence. For the same purpose, they were admitted and proved, and urged upon the consideration of the jury. And now the defendants complain, superadded to all this, that the judge either did not at all, or did not with sufficient emphasis, declare to the jury, that these circumstances were in truth badges of fraud ! This was not necessary. It would have been only a repetition of what, throughout the trial, had been mutually conceded by the parties, and understood by the jury, as true.

But there are other questions raised on this motion, which do not fall under the foregoing classification. There are objections to the plaintiffs' title to the iron in controversy.

1. It is claimed, that the pretended sale to the plaintiffs by *Payne*, was void, as falling within the provisions of the 2nd section of our statute of frauds and perjuries—that they did not accept and actually receive any part of the iron, nor give any thing in earnest, &c. What are the facts ? The iron sold consisted of a large quantity, 93 tons, and was lying by itself, and separate from all other iron. The parties met at the place where the iron was, and concluded the terms of the sale, by agreeing upon the price and its applica-

HARVARD LAW LIBRARY

tion upon the debts due to the plaintiffs ; and then *Payne* and the plaintiffs, as the motion finds, stepped up to the iron, and *Payne*, the vendor, said to the plaintiffs, the vendees, " I deliver this iron to you, at that price," &c. ; and then *Lockwood* came up, and claimed the iron, which he afterwards removed, and for which conversion the present action was instituted. There was here nothing remaining to be done, by the vendor, to consummate the sale or delivery. He had no further claim upon the iron. The ponderous nature of the commodity rendered the removal of it, at that time, impossible. And why should it have been moved ? The vendees were there, upon the ground ; and went up to receive the iron, when it was delivered by the vendor. The delivery was not symbolical, but actual ; and it was received by the vendees at the hands of the vendor, with the intent to take and hold the possession of it. The iron was not to be weighed off, and separated from any other, and thus designated. There it was, a parcel of 93 tons, by itself. *Chaplin* v. *Rogers*, 1 *East*, 192. *Manton* v. *Moore*, 7 *Term R.* 67. *Stoveld* v. *Hughes*, 14 *East*, 308. 2 *Kent's Com.* 394. Another sufficient answer to this claim, is, that it does not appear that the objection now made, was made in the superior court.

2. The defendants say, that before the sale to the plaintiffs, other creditors of *Bradley* had attached this iron, and, when sold to the plaintiffs, it was in the custody of the law, subject to those attachments. If there was no fraud in the contract between *Bradley* and *Payne*, *Bradley*'s creditors could not legally attach this iron as his property ; they were trespassers in doing this. Although in the sale of real estate, a disseised owner can convey no title ; yet this principle has never been extended to the case of a mere lien, nor to the sale of personal estate. A trespasser, at any rate, cannot so interfere as to prevent the real owner of personal property from transferring his title to it.

3. Again, it is said, that *Payne* himself had only a limited right to this iron, and could only sell it parcel by parcel, and from time to time, as the debts guarantied by him became payable ; and that some, if not all, of the debts due from *Bradley* to these plaintiffs, and for the security or payment of which this sale was made, had not yet fallen due. We think such a construction of the contract between *Bradley*

*Litchfield*,
June, 1845.

Calkins
*v.*
Lockwood.

and *Payne*, would be opposed to the intention of the parties. It must have been their purpose, that *Payne* should be empowered to keep himself in cash funds, by a sale of the iron, ready to meet his responsibilities as they should mature. They could not have intended to restrict him from selling until the moment the guarantied debts were due, and then, for the first time, find a market, while exposed to suits. And therefore, a material stipulation of the contract was, that *Payne* might controul and direct the sale of the iron, and receive the notes and money therefor, until he should raise a sufficient sum to meet " all the liabilities he has, or may hereafter assume, and may, at any time, sell and dispose of stock, and such personal property, to *raise funds* to meet such liabilities." Here is as ample power given to sell as language can well express; and this in conformity with the obvious nature and urgency of the case. And pursuing the same idea, the contract provides, that if *Payne* should sell more than the amount of his liabilities, he should account with *Bradley* for the balance—not that overplus sales should cease.

The subsequent stipulation on which the defendants rely, does not conflict with the clear purpose before developed. " It is also agreed, that said *Payne* shall not sell and dispose of property any faster than may be necessary to raise *funds* to pay said liabilities, from time to time, as they shall fall due and payable." This provision does not restrict *Payne* from selling beforehand, to *raise funds*. Its language imports no such meaning, and cannot be so understood, without rendering ineffectual the clearly defined intent before expressed. More than this ; the contract stipulates, that the lien of *Payne* and his right to controul the property, should continue and exist, at all times, till he should be completely discharged from said contract. *Payne*, by virtue of this lien, might deliver over this iron and his interest in it, to these plaintiffs, in security or payment of the very debt to secure which his lien was created, without discharging the lien. They would stand in his place, and the lien would accompany the possession, in such case, so far at least as to give a right of possession to the plaintiffs until the lien should be discharged, by payment of the debt secured by it. It is entirely unlike the case of a sale of a pledge, by the pawnee, in defiance of the rights of the pawnor. *Urquhart* v. *McIver, 4 Johns.*

*Lilchfield,*
*June, 1845.*

Calkins
*v.*
Lockwood.

R. 103. *McCombie* v. *Davies,* 7 *East,* 5. *Nash* v. *Mosh-ier,* 431. We think the objections to the plaintiffs' title are without legal support.

4. Again, it is said, that the case shows no conversion, by any other defendant than *Lockwood*—that no demand was made of any other person. The plaintiffs claim nothing from the demand of *Lockwood* and his refusal to restore the iron. They rely upon the fact, that, after this, and after the title was clearly restored in themselves, *Lockwood,* acting for the other defendants, as their officer, in their service and by their directions, removed the iron, and has ever since retained it. Here is no splitting up of causes of action. The unlawful intermeddling with this property commenced in *Payne's* time ; but it continued and was consummated, by the actual conversion of it, after the sale and delivery to the plaintiffs. Besides, we do not see, that any request was made of the judge to charge upon the matter of conversion ; nor that there was any real controversy, in the court below, on this subject. *Pattison* v. *Robinson,* 5 *M. & S.* 105.

5. The defendants suppose, that the charge of the judge regarding the secrecy of the contract between *Bradley* and *Payne,* was not sufficiently explicit and full. It was, that if, for the purpose of giving *Bradley* a false credit, it was a part of that design to keep the existence of the contract a secret, or if *Payne* suffered *Bradley* to hold himself out, or if *Payne* held him out, to the world, as the owner of the property, with such corrupt intent, the contract was void, as against *Bradley's* creditors. This was stating the law very favourably for the defendants ; but they required more ; they asked the judge to instruct the jury, that if there was no such original intent, yet if the jury found, that *Payne* did in fact keep the contract a secret, and if *Bradley* was suffered to hold himself out as the owner of the iron, then the sale from *Bradley* to *Payne* was void in law. Such circumstances were very proper evidence to be submitted to the jury, and from which they might perhaps infer a fraudulent intent ; but it cannot be admitted as a principle, that a mortgagee, or attaching creditor, or other person having a lien upon personal property, is obliged, as a volunteer, to make public the existence or the character of his claim.

This contract was, in its nature, such as to leave *Bradley*

*Litchfield,*
June, 1845.

Calkins
*v.*
Lockwood.

in the management and as the ostensible owner of the iron. Not only so, he was in fact the owner, subject to *Payne's* right to perfect his contract of lien, by taking the actual possession of it. And these defendants are placed in no condition of hardship greater than if *Payne* had, for the first time, purchased this iron of *Bradley*, one day, or one hour, before they attached it; nor were they any more defrauded than any creditor is, who delays his attachment until after the property of his debtor has been sold to another. *Seymour* v. *Hoadley*, 9 *Conn. R.* 418.

6. It seems, that a separate parcel of iron, called "No. 1. iron," of ten tons, and subject, as *Payne* claimed, to his lien, had been previously sold, by *Bradley*, to one *Clark*. *Clark* had never taken possession of it, and removed it, but suffered it to remain in *Bradley's* possession. Notwithstanding that, *Payne* claimed it under his contract; but he supposed, he should, in some way, make a clearer case for himself in respect to this parcel, by attaching it, on a separate claim against *Bradley*. He attached it accordingly, and, as the defendants claimed, all the other iron also. The attachment was, however, very soon abandoned. The court charged the jury, upon these facts, that *Payne* might well attach the parcel of ten tons of iron, thus left in *Bradley's* possession; and that, if he did attach it, as the defendants claimed, he did not thereby forego any of his rights under his contract with *Bradley*. We discover no objection to this part of the charge. It conforms to our repeatedly expressed opinions, regarding the effect of a vendor's continued possession. And we are not acquainted with any principle, which forbids a creditor from resorting to all the means of security which the law has placed within his reach.

We are very well satisfied, that even this prolix motion discloses nothing which demands a new trial.

In this opinion the other Judges concurred, except WAITE, J., who dissented on the last point, and STORRS, J., who was not present.

New trial not to be granted.