HENRY S. ROWAN *vs.* SHARPS' RIFLE MANUFACTURING COMPANY.

*R & L,* in January, 1852, entered into a written contract with the respondents, that with the aid of $40,000 to be advanced by the latter, they would purchase land, erect thereon a factory, equip it with all necessary machinery, and manufacture 20,000 rifles for the respondents on or before January 1, 1855 ; the land and factory to be conveyed to the respondents and the legal title held by them until the contract was performed ; the stipulated price of the rifles to be paid on delivery, and a deduction of $2 per rifle to be made from such payments for the repayment of the $40,000 advanced. *R & L,* with the aid of the money thus advanced, bought the land and built and equipped the factory, expending more than $100,000 for the purpose. The land was conveyed, by the party from whom it was purchased, directly to the respondents, who thereafter held the legal title. In 1854, *R & L* made a mortgage of the premises to a party to secure a debt of $75,000 for machinery purchased to put into the factory. This mortgage was immediately put upon record, but did not come to the actual knowledge of the respondents until December 1855. *R & L* had from the first been embarrassed from the want of sufficient funds, and it had been necessary for the respondents

Rowan v. Sharps' Rifle Manufacturing Company.

to make them large advances from time to time, to enable them to perform the
contract, and to prevent their failure. These advances they continued to make,
down to October 1856, when R & L failed, leaving the contract for the manu-
facture of the 20,000 rifles not fully performed. At this time the balance due to
the respondents on account of these advances, beyond the original advance of
$40,000, (and certain other advances specially secured,) was over $75,000. The
mortgagee had taken his mortgage with knowledge of the contract of R & L
with the respondents, and he afterwards assigned it to a party who, at the time
he took it, had such knowledge. On a bill to redeem, brought by the assignee
of the mortgage, it was held:—1. That the absolute legal title being in the
respondents, they were not affected by the record of the mortgage in 1854, and
that any advances which they might have made, down to December 1855, when
they received actual notice of the mortgage, constituted a valid charge on the
real estate, which took precedence of the lien created by the mortgage. 2. That
after they received actual notice of the mortgage, the respondents still had the
right to make all advances to R & L which were necessary to enable them to
perform the contract, and that these advances became a charge on the real estate
precedent to the lien of the mortgage.

The contract of 1852, between R & L and the respondents, contained a provision that
the latter, on giving certain notice, might, at their election, take the entire prop-
erty at an appraisal. The respondents elected so to take it, during the pendency of
the bill to redeem. The petitioner thereupon filed a supplemental bill, setting up
this fact, and praying for a decree that the balance of the fund, after paying the
prior claim of the respondents upon it, should be paid over to him. The peti-
tioner held the mortgage in behalf of the British government, and the suit was
brought for the benefit of that government. The respondents filed a cross bill
alleging a claim against the British government, in part for moneys withheld as
a stipulated forfeiture, for the non-performance, within the time limited, of a con-
tract with the British government for the manufacture of rifles, the delay in the
performance being alleged to have been caused by the wrongful interference and
tortious acts of the agents of the British government, and in part for damages
for tortious acts of such agents in injuring parts of rifles submitted to them for
inspection under the contract. The petitioner denied the right of the respond-
ents to make the set-off, on the ground that the claim was founded on tort, and
that the British government, having attachable property within the state, could
be sued by the respondents in an action at law. Held, that the respondents could
set off the claim for moneys so withheld, which was to be regarded as a claim
founded on contract. Whether they could set off the claim for the damages: Quere.

Whether the British government, having attachable property in this state, could be
sued in our courts: Quere. The court inclined to the opinion that it could not.

Where a mortgage of a factory and its equipments embraced in its terms such ma-
chinery and stock as should be afterwards purchased and placed upon the prem-
ises, and the mortgagee had afterwards taken possession of the factory with
such subsequently acquired property, it was held that, whatever effect was to be
given to the provision in itself, it became operative upon possession being taken
by the mortgagee, so as to make the mortgagee chargeable with the property, in
favor of later incumbrancers, as a part of the mortgage fund.

BILL to redeem certain mortgaged premises; with a sup

plemental bill alleging that the respondents, since the suit was brought, had become the purchasers of the premises under a provision of their original contract with the mortgagors, by which they had the right, on giving certain notice, to take the premises at an appraisal, and praying that the respondents be required to pay over to the petitioner the balance of the appraised value of the premises, after satisfying their own lien. The petitioner held his mortgage as agent of the British government, and brought the suit for its benefit. The respondents filed an answer and cross-bill, in the latter setting up a large demand against the British government, which they claimed the right to set off against the demand of the petitioner. The case was referred to a committee whose report embraced the following facts:—

On the 9th day of January, 1852, the following contract was entered into between the mortgagors, Robbins & Lawrence, of the first part, and the respondents, Sharps' Rifle Manufacturing Company, a joint stock corporation, of the second part:—

" Whereas, heretofore, viz: on the 25th day of June, A. D. 1851, a certain contract or agreement was made and entered into by and between said parties of the first part, and one George H. Penfield, of the city, county and state of New York, relative to the manufacture of ten thousand of Sharps' patent rifles or fire-arms by said party of the first part for the said George H. Penfield, which said contract in fact bears date the 25th day of September, A. D. 1851, and was on the 18th day of December, 1851, by the said Penfield sold, assigned and transferred to said Sharps' Rifle Manufacturing Company, and was then and there assumed by said company on the part and in behalf of said Penfield, by and with the assent and approbation of the said Robbins & Lawrence, a copy of which is hereto annexed, and is made part and parcel of this contract, in the same manner and to the same extent as if it had been fully and at large set forth in this present instrument, except so far forth as is hereinafter provided:—

" Now, therefore, the said party of the first part, in considera-

tion of one dollar received to their full satisfaction of the said party of the second part, and in consideration of the further sums of money to them, the said Robbins & Lawrence, to be paid by the said party of the second part, do for themselves, their executors, administrators and assigns, covenant and agree to and with the said party of the second part, their successors and assigns, to furnish the necessary funds, and purchase a suitable site, with the approbation of the directors of said company, and located in said town of Hartford, and erect thereon all such buildings, and supply the same with the necessary power, shafting, machinery and tools to constitute and equip an armory, or manufactory of the first class for the manufacture of fire-arms, and of sufficient capacity, in all its parts, to manufacture ten thousand Sharps' patent fire-arms per annum, in a good and workmanlike manner; the whole to be done and completed in or before the month of August, 1852, and sooner if practicable; which said lands, buildings, power, machinery and tools, shall be conveyed to said Sharps' Rifle Manufacturing Company, and the legal title thereto be and remain in said corporation during the continuance of this contract, subject to the possession, use and control of said Robbins & Lawrence to the first day of January, 1855, for the purposes hereinafter stated.

" And the said party of the first part, for themselves, their heirs, executors and administrators, do further covenant and agree to and with said party of the second part, their successors and assigns, to furnish all the necessary stock, and manufacture for said party of the second part, their successors and assigns, the additional number of ten thousand of Sharps' patent rifles or carbines, of both descriptions, at the option of said party of the second part, their successors or assigns, in a good and workmanlike manner, and in every respect to be like the models furnished said party of the first part by the party of the second part, and to be inspected by a qualified inspector, whose fees for inspection are to be paid by said party of the second part, and to be delivered to said party of the second part at the rate of two hundred per week from and after the delivery of the ten thousand arms contemplated in the aforesaid contract with said Penfield, and the

whole of said additional ten thousand arms to be fully completed and delivered as aforesaid, on or before the first day of January, 1855; said ten thousand arms last named, and the number of five thousand at least of those embraced in said prior contract hereinbefore referred to, to be manufactured at said armory in Hartford, and delivered thereat.

" And said party of the first part do further agree to and with said party of the second part, that the said party of the first part will receive of the Massachusetts Arms Company, and pay for, one index milling machine valued at four hundred and seventy-five dollars, and one cone and screw machine valued at four hundred dollars; and also will take, purchase and receive of said party of the second part, all the machinery, tools, implements, and stock on hand which said party of the second part now owns and which may be serviceable, except guns in the process of manufacture, nearly completed, at a valuation to be agreed on by the parties, or assessed by two judicious persons to be nominated one by each party; the sum at which the same shall be assessed to be applied in payment for the first arms manufactured under the said contract assigned to said company aforesaid; and that said party of the first part shall and will keep a just and true account of the cost of said land, buildings, machinery, tools, stock, and all expenses of manufacture of every name and nature during the continuance of this contract and connected with said armory, on books which shall at all times be open to the inspection of the superintendent and directors of said Sharps' Rifle Manufacturing Company, and lodged at said armory or at an office in the city of Hartford; and that at the expiration of this contract, to wit: on the first day of January, 1855, it shall be at the option of said party of the second part, to hold, have, and enjoy the absolute and unconditional title of all such lands, buildings, power, privileges, machinery, tools and appurtenances connected with said armory, and to have the exclusive possession and enjoyment thereof forever thereafter, they yielding and paying therefor, to the said party of the first part, a fair valuation to be agreed on by the parties, or, in case of their inability to agree, to be fixed and established by three

competent men, one to be named by each party, and the two thus named to select a third to act in concert with them, who shall fairly estimate the value thereof, and their decision when so made to be final and conclusive on the parties; provided however, that said party of the second part shall, in case they elect to take said armory and equipments as aforesaid, give at least six months' notice in writing to that effect to said party of the first part, their heirs, executors or administrators, prior to said 1st of January, 1855.

"That said party of the second part agree to and with said party of the first part, to receive of them all said arms, amounting in the whole to the number of twenty thousand, and pay to said party of the first part for each of said additional ten thousand arms the sum of twelve dollars, on delivery thereof at Hartford aforesaid.

"And said party of the second part further agree to and with said party of the first part, that for the purpose of better enabling said party of the first part to carry out and complete this contract, and erect and equip said armory at Hartford, the said party of the second part will, on the receipt of satisfactory security from said party of the first part, advance to said party of the first part the sum of forty thousand dollars, in four equal payments of ten thousand dollars each, payable, one on the 8th day of April, 1852, one on the 8th day of May, 1852, one on the 8th day of July, 1852, and one on the 8th day of September, 1852, the principal of which sum of forty thousand dollars shall be reimbursed to said party of the second part, their successors or assigns as aforesaid, by a discount of two dollars from the contract price of each of said twenty thousand arms delivered to said party of the second part, their successors or assigns as aforesaid. The legal interest on said sum, from the date of the advancement to the time of the reimbursement to said party of the second part, to be paid by the said party of the first part on the first day of January next, and annually thereafter.

"And said party of the second part hereby covenants and agrees to and with said party of the first part, their heirs, executors, administrators and assigns, that in case the said party

of the second part do not elect to take and hold said armory and the estate connected therewith as aforesaid, said party of the second part, their successors and assigns, will execute and deliver to said party of the first part, or to their legal representatives, conveyances of release thereof, whenever this contract and the contract hereunto annexed as aforesaid, shall have been fully executed in all their parts by said party of the first part, their heirs, executors, administrators or assigns, so far as the same are obligatory and binding on them. * * * *

"In testimony whereof, the parties have hereto set their hands and seals, and also to a duplicate of the same tenor and date, on the day and year above written."

Under this contract the respondents advanced to Robbins & Lawrence the sum of $40,000, stipulated for in the contract, and Robbins & Lawrence, with this aid, and with their own funds and by means of their own credit, purchased a tract of land as a site for the factory, and erected buildings thereon, and supplied them with the necessary power and machinery for the manufacture of fire-arms according to the contract, and went into possession of the same in the manner and for the purposes provided for in the contract, expending in the purchase of the land and in the erection and equipment of the factory more than $100,000. The land was conveyed, by the parties of whom it was purchased, immediately upon its purchase, and before the erection of the buildings thereon, directly to the respondents, by absolute deeds; and they had ever since held the legal title so conveyed, (except to a portion of the same, afterwards released to Robbins & Lawrence, and not involved in the present suit.) The deeds under which the respondents held the legal title were immediately put on record, but the contract was not recorded with them.

On the 22d day of September, 1853, the respondents having made further advances to Robbins & Lawrence to enable them to carry out their contract, the latter executed and delivered to them a mortgage deed of the land, factory and equipments, and of the stock in the factory, to secure them for these advances, which mortgage was immediately after recorded. The whole indebtedness of Robbins & Lawrence to the respondents at this date and for the security of which the

mortgage was given, amounted, (including the $40,000 origi-
nally advanced and which was in terms included with the
other advances named in the mortgage) to $67,828, exclusive
of interest, and the respondents were further secured by the
mortgage for indorsements already made and thereafter to be
made by them for the benefit of Robbins & Lawrence, of the
drafts of the latter on one E. B. Foster of Boston, to an
amount not exceeding $25,000.

This mortgage contained a clause with regard to property
afterwards to be acquired, about which an important question
arose in the case. After specifically describing a large quantity
of machinery as conveyed by the mortgage, it proceeded as
follows:—" And all the machinery, tools, stock manufactured
and in process of manufacture, fuel and personal estate, in
said factory buildings, or which may be therein during the
continuance of this mortgage."

On the 9th day of December, 1854, Robbins & Lawrence
executed and delivered to " The Robbins & Lawrence Com-
pany," (a corporation chartered by the legislature of Vermont
and located in that state, and most of the stock of which was
owned by Robbins & Lawrence, and of which Samuel E. Rob-
bins, of the firm of Robbins & Lawrence, was president and
a director,) a mortgage of all the real and personal estate
before described, to secure a note of $75,000 given by them
to the mortgagees for machinery purchased of them and put
into the factory. This mortgage, as will be afterwards ex-
plained, was held at the time of the suit by the petitioner, and
his claim to a right of redemption was based upon it. It was
put upon record immediately after its execution. The mort-
gage embraced, by specific description, all the real and personal
property specifically described in the mortgage of Robbins &
Lawrence to the respondents, and sundry articles of machinery
purchased since the execution of that mortgage, and contained
the same general provision with regard to machinery, tools,
stock and other personal property " contained in said factory
buildings, or which [might] be contained therein during the
continuance of the mortgage." This mortgage was made
expressly subject to that of the respondents.

At the time of receiving this mortgage, the Robbins & Lawrence Company had actual knowledge of the prior mortgage to the respondents, and of the contract of January 9, 1852, between Robbins & Lawrence and the respondents, but the respondents had no actual knowledge of this mortgage to the Robbins & Lawrence Company until on or about the 11th day of December, 1855, and no notice except such as the law would infer from the record of the mortgage.

On the 11th day of December, 1855, the Robbins & Lawrence Company, having a large contract with Fox, Henderson & Co., of London, for the manufacture of Minie rifles for the British Government, upon which Fox, Henderson & Co. had already advanced them $100,000, assigned to them the mortgage of Robbins & Lawrence, together with the note for $75,000, as part security for the $100,000 so advanced, and for the further sum of $30,000 advanced at the time of the assignment of the mortgage, and as security for the performance of the contract for the manufacture of the arms. The money thus advanced by Fox, Henderson & Co., was advanced to them by the British Government, under a contract of the former to supply a large quantity of rifles to the government; and subsequently Fox, Henderson & Co. for the purpose of securing the British government for the advances so made, assigned to Henry S. Rowan, the petitioner, the mortgage so held by them, with the $75,000 note, and the contract of the Robbins & Lawrence Company for the manufacture of the rifles, together with certain supplemental contracts on the same subject to which Robbins & Lawrence had also become parties. The mortgaged premises were conveyed, as well as the mortgage assigned, both by the Robbins & Lawrence Company to Fox, Henderson & Co., and by the latter to the petitioner. The conveyance to the petitioner was by absolute deed in his own name, but he in fact received the securities as agent of the British government, and the contracts were assigned to him as "nominee of her Britannic Majesty's principal Secretary of State for the War Department."

The contract of the Robbins & Lawrence Company for the manufacture of arms was never fully performed, and there

remained undelivered, at the time of the trial, 9,000 rifles out of 25,000 agreed by the contract to be delivered, and there was found to be due to the petitioner on the 1st day of January, 1859, on account of the advances made by the British government in aid of the contract, the sum of $97,595.62, besides a large forfeiture, for the non delivery of rifles within the time stipulated by the contract, which had been provided for by a later contract between the parties.   It was also found that no part of the $75,000 note of Robbins & Lawrence to the Robbins & Lawrence Company, and which was held by the petitioner with the mortgage securing the · same, had ever been paid, and that there was due thereon, on the 1st day of January, 1859, the sum of $93,234.24.

On the 9th of November, 1855, Robbins & Lawrence entered into another contract with the respondents, by which they agreed to manufacture and deliver to the respondents six thousand five hundred rifles, on or before the 1st of April, 1856. A considerable part of the rifles embraced in the contract of January 9, 1852, then remained undelivered.

Robbins & Lawrence soon after they began the performance of the contract of January 9, 1852, became embarrassed from the want of sufficient funds to carry on their business, and, at their urgent solicitation, the respondents advanced to them money from time to time to enable them to perform that contract, and afterwards the contract of November 9, 1855, and continued to make such advances down to the time of their failure on the 26th of October, 1856.   These advances were made for the purchase of stock and materials and for the payment of workmen, and for other things requisite for the performance of the contracts.   After the respondents began to make these advances, Robbins & Lawrence agreed that the arms thereafter delivered might be applied for their repayment before being applied to the payment of the mortgage debt.   The amount due to the respondents, on account of these advances, on the 14th day of October, 1857, was $75,772.40, beyond the amount secured by their mortgage of September 22, 1853.

A short time before the 11th of December, 1855, Fox, Henderson & Co. desiring security from the Robbins & Lawrence

Company for the $100,000 already advanced and for further advances that were proposed, it was arranged that the Robbins & Lawrence Company should assign to them the $75,000 mortgage of December 9, 1854, which Robbins & Lawrence had made to the Robbins & Lawrence Company, and that Robbins & Lawrence should become parties with the Robbins & Lawrence Company to the contract with Fox, Henderson & Co. for the manufacture of the 25,000 Minie rifles, and should mortgage to Fox, Henderson & Co. a part of the tract of land pertaining to the factory, of which the respondents held the legal title, after procuring from the respondents a release of such part of the tract. They therefore applied to the respondents for such release, and on the 11th day of December, 1855, the following vote was passed by the respondents, at a meeting of the directors of the company.

" *Voted*, That the president be authorized to execute a release of the company title and interest in and to the land and buildings lying east of a line drawn parallel to the eastern wall of the boiler house annexed to the main factory building, and distant therefrom in an easterly direction three feet; extending from the Little River on the north to the Babcock farm on the south, except the strip of land lying north of the street and between the brook and the enclosed land, on which strip of land the cartridge shop and magazine of the company are situated; also, all the land and buildings thereon lying west of a line drawn from Little River to the Babcock farm, parallel with the west side of the factory building, and distant therefrom one hundred and fifty feet, to Robbins & Lawrence, to enable them to secure the sum of one hundred and thirty thousand dollars, advanced them by Fox, Henderson & Co. toward a contract for twenty-five thousand Minie rifles; and on the fulfillment of said contract, said land and buildings, with all the machinery, tools, engines and fixtures, to be reconveyed to said Sharps' Rifle Manufacturing Company; and upon condition that the said Robbins & Lawrence execute a mortgage of said premises, buildings, machinery, stocks, fixtures, and tools so mortgaged to said Fox, Henderson & Co. or to other parties for their use and benefit, to said Sharps' Rifle Manufac-

turing Company, independent of any other lien; and also to secure to the company the right to take the entire property, as contemplated by the contract of 9th of January, A. D. 1852, at such time as may be acceptable to the executive committee."

The whole tract contained about twenty-five acres. The parts to be released were two outer sections of the tract, leaving the central section, with the main factory thereon, to remain as before in the respondents. This central section alone, with the factory upon it, and the personal property contained in it, constituted the subject matter of the suit. The release of the parts described in the vote was executed on the same day by the president of the company, and delivered to Robbins & Lawrence, who at the same time executed a mortgage of the same to Fox, Henderson & Co. The assignment of the mortgage held by the Robbins & Lawrence Company, was at the same time executed by the president of that company and delivered to the agent of Fox, Henderson & Co. who was present, and shortly after, on the same day, Robbins & Lawrence executed and delivered to the respondents the following contract, extending the time within which the respondents were to elect whether to take the factory property, as provided in the contract of January 9, 1852.

" It is hereby agreed by and between Samuel E. Robbins and Richard S. Lawrence, of the first part, and Sharps' Rifle Manufacturing Company of the second part, in consideration of one dollar paid to said Robbins & Lawrence by said Sharps' Rifle Manufacturing Company, that the time for the Sharps' Rifle Manufacturing Company to elect whether they will take the land, buildings, machinery, fixtures and tools, known as the Sharps' Rifle Manufacturing Company property, situated in said Hartford, absolutely, upon the terms and conditions in other respects contained in the contract of said Robbins & Lawrence with said Sharps' Rifle Manufacturing Company dated January 9th, 1852, be extended until thirty days after the fulfillment of the said contract of the 9th of January, 1852, and also the contract of Nov. 9th, 1855, on the part of said Robbins & Lawrence, and the payment of all indebted-

ness from said Robbins & Lawrence to said Sharps' Rifle Manufacturing Company; and in case said Sharps' Rifle Manufacturing Company elect to take said land and buildings aforesaid, the said Robbins & Lawrence, or their assigns, shall have the privilege of using such parts of said building as are employed in the manufacture of the Minie rifle, for a period not exceeding six months thereafter, they paying therefor rent to be determined at the time and in the manner provided for the valuation thereof. In testimony whereof, we have hereto set our hands and seals, this 11th day of December, 1855."

The mortgage required by the vote, from Robbins & Lawrence to the respondents, after the mortgage of Robbins & Lawrence to Fox, Henderson & Co., was never given. It was found that the vote of the directors of the respondents' company was read by the president of the company to Robbins & Lawrence, the Robbins & Lawrence Company, and Fox, Henderson & Co., before the execution of the release, and that the release was delivered by the president to Robbins & Lawrence in reliance upon their promise to execute all the papers required by the vote; which fact was known to the Robbins & Lawrence Company and to Fox, Henderson & Co.; and that the nature of the above agreement afterwards executed by Robbins & Lawrence, was then made known by the respondents to the Robbins & Lawrence Company, and to Fox, Henderson & Co. It was also found that Fox, Henderson & Co. had notice, at the time, of the contract of January 9, 1852, and that during the negotiations they were informed by the respondents of the amount then due them from Robbins & Lawrence.

Upon the failure of Robbins & Lawrence in October, 1856, the respondents took possession of the factory and appurtenances, (except the two sections released,) and proceeded to manufacture the rifles which, by the contract of November 9, 1855, Robbins & Lawrence were to have manufactured for them, and of which there remained, at that time, three thousand and one hundred undelivered. These rifles were needed by the respondents to enable them to perform a contract which they had entered into with the British government some time be

Rowan *v.* Sharps' Rifle Manufacturing Company.

fore, for the manufacture and delivery of 6,000 rifles, and which they had entered into in reliance upon the manufacture and delivery of rifles by Robbins & Lawrence in season for the delivery to the British government required by the contract of the respondents with that government, the agents of the British government having full knowledge at the time the contract was entered into by them, that they were dependent for the means of fulfilling their contract on the manufacture of the rifles by Robbins & Lawrence. The respondents continued to occupy the factory and manufacture rifles, charging to Robbins & Lawrence, as advances, all expenses incurred, and crediting to them the price of the rifles stipulated for in their contract with them, until the 14th day of October, 1857, when the whole quantity required by their contract with the British government had been manufactured and delivered.

The contract of January 9, 1852, was never fully performed by Robbins & Lawrence, and there were finally left undelivered three thousand and eighty of the twenty thousand rifles contracted to be delivered.

On the 2d day of July, 1857, the respondents, under the provisions of the contract of January 9, 1852, and of that of December 11th, 1855, elected to take the factory property, and gave the notice of such intention required by the contracts. An appraisal of all the property was accordingly made, according to the provisions of the contract of January 9, 1852, by which, and by a correction made by the committee, the value of the property was fixed as follows :—

| | |
|---|---:|
| The land and building, with shafting and fixtures, | $46,588.19 |
| Steam engine, boilers and appurtenances, . . | 4,500.00 |
| Machinery and belting, . . . . | 40,376.33 |
| Tools, . . . . . . . . | 14,298.58 |
| Stock on hand, and parts of arms, finished and unfinished, . . . . . . | 41,478.21 |
| | $147,241.32 |

A part only of the machinery, amounting at the valuation to $24,898.08 was included by specific description in the mortgage of September 22, 1853 to the respondents. In addition

to these articles of machinery, a further portion, amounting at the valuation to $6,750.70, was included by specific description in the mortgage of December 9, 1854 to the Robbins & Lawrence Company. A part of the machinery, amounting at the valuation to $2,018.43, was not included in either of the two mortgages. All or nearly all the tools with their appendages and the belting embraced in the appraisal, were purchased by Robbins & Lawrence after December 9, 1854, the date of the last of the two mortgages, to supply the place of tools and belting of the like kind which were on hand at the respective dates of the mortgages. All of the stock and materials for the manufacture of arms and unfinished work which were included in the appraisal were purchased after December 9, 1854, to replace articles of the like kind which were on hand at the respective dates of the two mortgages.

The original advance of $40,000 described in the contract of January 9, 1852, and secured by the mortgage of September 22, 1853, had been in part paid, previous to the 14th of October, 1857, by the application, under the provisions of the contract, of $2 upon every rifle delivered, and on that day the balance of this sum remaining due was $6,513.17. The other advances secured by the mortgage remained unpaid, and the respondents had been compelled to pay upon their indorsements of the Foster drafts described in the mortgage, considerably more than the $25,000 of such indorsements secured by the mortgage. It was found that the debt secured by the mortgage of Robbins & Lawrence to the respondents, was $71,610.30.

The respondents, on the trial before the committee, with assent of the opposing counsel, amended their answer by introducing sundry averments with regard to wrongful acts of the agents and inspectors of the British government in capriciously requiring changes in the construction of rifles which the respondents were manufacturing under a contract with the British government, and in the wanton defacing and destruction of parts of rifles which were rejected by them upon inspection, and claimed to set off, against the demand of the petitioner, a large demand against the British government for

moneys withheld by the latter as a forfeiture on account of the non-delivery of rifles within the times provided by the contract, for which the contract had provided such forfeiture, and a further claim for damages for such injury to their property. The respondents claimed that the delay in the delivery of the rifles was owing to such changes required in their construction, and to the unreasonable and wrongful conduct of the viewers of the British government in their inspection of the rifles. The counsel for the petitioner assented to these amendments upon the stipulation of the respondents that, if the facts proved were held admissible by the court, a supplemental hearing should be had before the committee upon the questions of fact, as they were not prepared with evidence on the subject ; and under this arrangement the evidence of the respondents on the subject was heard, while the petitioner introduced no evidence in reply. On this evidence the committee found that the capricious changes in the details of the rifle manufactured while it was in the progress of manufacture, made by the agents of the British government, and the unreasonable and wrongful acts of the viewers in inspecting the guns, had rendered Robbins & Lawrence unable to make the deliveries to them in season for them to make the deliveries to the British government, as required by their contract with the latter ; and that in consequence of such delay the respondents had forfeited, under the provisions of the contract, $5 for every rifle undelivered within certain specified times, amounting in all to $25,950 ; which sum the British government retained. It was also found that the respondents had, in consequence of such delay in the delivery, suffered a loss from the detention of the remainder of the price, beyond the time when they would otherwise have received it, of $3,000, and a further loss, from the destruction of property by the viewers, of $2,570.18. These sums, with interest upon them, were found by the committee to amount to $33,578.78.

It was found that the British government held, in the name of the petitioner, the real estate released by the respondents and mortgaged to Fox, Henderson & Co. by Robbins & Lawrence, with a large amount of machinery included in that mortgage,

and still remaining on the premises, which mortgage·had been foreclosed by the petitioner, and that the value of the land and machinery thus held was $60,000.

The whole fund resulting from the purchase of the factory property by the respondents, as before stated, was $147,241.32. The mortgage debt of the respondents, as before stated, was $71,610.30. This sum the petitioner admitted the right of the respondents to retain, but claimed that the balance, $75,631.02 equitably belonged to him, as assignee of the mortgage of Robbins & Lawrence to the Robbins & Lawrence Company, which purported to cover all the property subject to the prior mortgage to the respondents, the sum due on that mortgage being greater than such balance. The respondents claimed the right to apply this balance to the advances made by them to Robbins & Lawrence outside of their mortgage, to enable them to fulfill their contracts of January 9, 1852, and November 9, 1855, which advances exceeded this balance in amount. They also claimed the right of set-off before stated. It was also claimed by the respondents that the machinery and personal property at the factory, procured after the date of the mortgage held by the petitioner, and particularly the stock, valued at $41,478.21, were not covered by that mortgage, and that the petitioner had consequently no interest in them, and no right to their application for his benefit. Other questions were made and numerous other facts were found, but they have proved unimportant in the result.

The case was reserved, upon the facts found, for the advice of this court.

*T. C. Perkins* and *Hooker*, with whom was *H. Whittaker* of New York, for the petitioner.

FIRST. The petitioner had a right of redemption before the purchase of the property by the respondents, and has now what is equivalent to it, the right to the fund representing the property after the mortgage debt of the respondents has been satisfied. The absolute deed of the respondents, with the contract of January 9, 1852, by which they were to hold the property as security, constituted together a mortgage, and an

Rowan *v.* Sharps' Rifle Manufacturing Company.

equitable interest was left in Robbins & Lawrence which they could convey. This equitable interest they mortgaged to the respondents, on the 22d of September, 1853, to secure certain advances of the respondents not secured by the contract, and had equally the right to mortgage the same interest, as they did to the Robbins & Lawrence Company, subject to that prior mortgage. This mortgage, now held by the petitioner, gave him, of course, a right to redeem the property specifically, if the respondents should not elect to take it under their contract, and the right to demand of them the value of the property if they should elect, as they did, to become the owners of it, after having applied so much of the value as was necessary to the payment of their prior lien. If the mortgaged property is to be regarded merely as a fund, then the mortgage held by the petitioner would be regarded as an assignment of the mortgagors' interest in it, as it stood at the time the mortgage was made.

SECOND. What then is the mortgage debt of the respondents, secured by the contract of January 9, 1852 in connection with the legal title, and the mortgage of September 22, 1853 ? This prior incumbrance, whatever it is, the petitioner would have to pay, if he was seeking to redeem the property specifically, and the same amount, neither more nor less, the respondents have a right to retain out of the fund in their hands. The debt secured by the mortgage of September 22, 1853, is found to be $71,610.30. The right of the respondents to retain this amount we admit. But they claim that, under the contract and legal title held in connection with it, the land is charged with the advances made since the mortgage, and amounting to $75,772.40, which is more than enough to absorb the whole of the remainder of the fund. We deny their right to retain any portion of this amount. It is very clear that the contract must, in its terms or necessary implications, give them whatever right they have to apply the property to the payment of these advances. It is found that the Robbins & Lawrence Company took the mortgage, and we the assignment of it, with knowledge of the contract. It is therefore, between us and the respondents, precisely as if the contract had been

embodied in the deed, and the whole had been spread upon the public records. The contract constituted the defeasance of their mortgage as much as if it had been inserted in their deed as such. We are to look at the terms of the contract, just as we look in other cases to the terms of a mortgage, to ascertain the precise extent to which it is a security. Regarding this as too plain for argument, we say :—

1. That the contract of January 9, 1852 was not intended as security for any thing whatever but the performance of the contract to manufacture the 20,000 rifles. It is expressly provided in it that the respondents will advance $40,000 to Robbins & Lawrence. This excludes the implication that other advances were intended, especially that all advances which might be made should be a charge on the property. And the $40,000 thus to be advanced was by the contract to be advanced only " on the receipt of satisfactory security," showing plainly that other security than that already held by the deed was thought necessary ; and we find the respondents accordingly soon after taking a mortgage of the property to secure this and some later advances.

2. That while it is admitted by us that the contract was never fully performed by the delivery of the whole number of rifles, yet it is not found that any damage resulted from the non-delivery. It appears that the further manufacture of rifles under this contract was abandoned by mutual consent, for the purpose of making those which would answer the demand of the contract of the respondents with the British government, and for the manufacture of which, by Robbins & Lawrence, a new contract was entered into between the respondents and them, on the 9th of November, 1855. It will not do to say that, as the respondents had made them advances which were equivalent to a prepayment for the rifles, the law will infer that they sustained damage to the amount of the value of the rifles undelivered. The contract expressly provides that the rifles were to be paid for " on delivery," and the respondents had no right, against us, who took our later mortgage with knowledge of, and in reliance upon, the terms of their contract, to make a prepayment for the rifles, and thus add ten

fold to the amount of their prior incumbrance.   The question is entirely different from what it would be if the respondents were merely seeking to recover damages of Robbins & Lawrence in an action at law for the breach of the contract, as was the case in *Bush* v. *Canfield*, 2 Conn., 485, as in such a case our rights as subsequent incumbrancers would not be affected.

3. The contract of Nov. 9, 1855 can not affect us.   It is found that this contract was not performed in full, and that by its non-performance the respondents sustained damage in not being able to perform their contract with the British government.   Our mortgage was taken in December 1854, and our rights became fixed at that date.   But it is said that the respondents had no actual knowledge of our mortgage until December 1855, and that, as they held the absolute legal title, they were not affected by the record notice.   We reply, that while a *stranger*, finding the legal title to be in them, and nothing in their deed to qualify the title, might not be bound to look further, yet the respondents themselves, who knew that they held only a mortgage interest, and that Robbins & Lawrence retained an equitable interest which might be mortgaged by them or levied on by their creditors, were bound to look to the public records to ascertain the state of their title before making any new advances on the security of the property, precisely as if they had held an ordinary mortgage.   The principle which would protect an innocent purchaser who might have taken a conveyance of the property from them, has no application to a new charge made on the property by themselves, who are to be regarded as purchasers with notice, or at least with such knowledge as ought to put them on inquiry. 1 Story Eq. Jur., § 403.   *Parkhurst* v. *Alexander*, 1 Johns. Cha. 394.   *Bellas* v. *Mc Carty*, 10 Watts, 13.   *U. States Ins. Co.* v. *Shriver*, 3 Maryl. Cha. Dec., 381.   *Shader* v. *Lawler*, 17 Ohio, 371.   However this may be, yet as to the machinery, which constituted a great part of the value, our mortgage was a valid one under the statute, and the respondents were bound to take notice of the record.   They had no title to this machinery except as mortgagees, their legal title being confined to the real estate.

4. Nor can we be affected by the extension contract of December 11, 1855. When this contract was made the respondents had full knowledge of our mortgage. It can make no difference that we knew of that contract. Our rights took effect from the date of our mortgage, and could not be affected by knowledge of a fact acquired afterwards. Besides that contract by its terms was merely intended to extend the time within which the respondents were to make their election whether to purchase the property, not to extend the lien which the respondents had by the legal title which they held. The vote of the respondents, requiring this extension contract as a condition of releasing a part of the property, speaks only of securing a further " time " for making this election.

5. It is to be observed that none of these advances were made for the benefit of the *real estate*. The only advancement for that purpose was the $40,000, all of which is paid but $6,513 ; and this is a part of the mortgage debt, which we admit the right of the respondents to receive. The advances in question, without exception, were merely to aid in the manufacture of the rifles, and not in any way to benefit the real estate. The case is therefore wholly unlike that of advances made by a mortgagee in possession or trustee for the benefit of the property held by them. Such advances are held to be a good charge on the estate against a later incumbrancer, on the ground that they are necessary to save the property from being sacrificed or injured, as where taxes are paid, or a prior incumbrance cleared off, or repairs made, all of which are directly beneficial to the later incumbrancer. 2 Story Eq. Jur., § 1275. *Hutton* v. *Weems*, 12 Gill & Johns., 83. *Miles* v. *Bacon*, 4 J. J. Marsh., 457. Here the respondents claim the right to sweep away the entire property, leaving nothing to the petitioner, and that to satisfy advances which were not of the slightest benefit to the property, and which were not made upon any exigency of the property itself.

6. It is very clear that if these advancements constitute a charge on the property that is to take precedence of our mortgage, yet they can constitute a charge only on the real estate, as it is only the real estate of which the respondents held the

legal title.   The real estate was but $46,588, leaving a fund of more than $100,000 on which the lien of the respondents prior to ours could be only their mortgage lien, amounting to $71,610, leaving nearly $30,000 for us.   As to all this personal property, our mortgage took effect from its date, and no subsequent rights could be acquired by the respondents by any new advances or new contracts.

THIRD.   The stock and machinery purchased after the date of our mortgage, are to be considered as covered by it, and are to be applied for our benefit.   The stock is valued at $41,478, and the machinery at $2,018.43.   The tools and belting are found to have been procured since the date of the mortgage to take the place of like articles worn out.   These would come within the mortgage upon the principle of accession.   *Holly* v. *Brown*, 14 Conn., 255, 266.   The stock and machinery however must rest upon the validity of the clause in the mortgage relating to after acquired property.   With regard to this we say :—

1. That while the mortgage could not operate at law to pass a present title, since the property was not in existence, yet that in equity it would be regarded as an executory contract to convey the property whenever it should be procured, and as equity regards that as done which a party ought to have done, it will regard the contract as performed by a conveyance of the property.   Such a provision in a mortgage has been held by high authorities to be operative between the parties, to create a lien in favor of the mortgagee upon the property when acquired.   *Mitchell* v. *Winslow*, 2 Story R., 639, and several cases there cited.   The cases where such a provision has been held not to be operative, are almost universally cases in which the question arose between the mortgagee and some *third party*, as an attaching creditor, *bona fide* purchaser, assignee in insolvency, &c.

2. That the question is to be regarded here as arising between the mortgagors and ourselves, and not between ourselves and a *bona fide* purchaser.   It is true that the question is made between the respondents and us, and that they are in fact a third party ; but they come in, not as purchasers, who have acquired

a *subsequent* interest, as is always the case with purchasers as the term is ordinarily used, but they have simply, by reason of their prior contract with the mortgagors, taken the property and substituted for it a pecuniary fund. It was not an ordinary purchase, but a mere transmutation of the mortgaged property from its specific form into money—the money taking the place of the property and liable to all the claims that existed against it. *Bona fide* purchasers are protected in their purchase, to save them from a loss of the consideration which they have innocently paid. Here no such protection is needed, as the respondents have paid nothing, and have parted with nothing, but have merely changed the form of the property. It is therefore merely the property (or fund) that we are dealing with, and we are to deal with it precisely as we would if it still stood in the name of the mortgagors, as the fund is theirs (and through our mortgage ours) just as much as the specific property was before.

3. It is to be observed that the mortgage of the respondents covers this property only by general description, as property to be subsequently acquired, precisely as ours does, except that ours covers by specific description machinery to the value of $6,750 which was procured after the date of their mortgage, and which is covered by the latter only by the general clause referred to. If the clause is good in their mortgage it is equally good in ours.

4. If it be said that the respondents have taken actual possession under their mortgage, while we have not, and that thereby their mortgage became operative upon this property, as held necessary in *Moody* v. *Wright*, 13 Met., 32, we reply, 1st. That as they took possession under their prior mortgage, and not as after purchasers, their possession was in no manner adverse to us, and does not operate to impair or foreclose any right of ours. 2. That after they had taken possession, a possession to which they were equitably entitled and which we were bound to yield, the law would not require us to take possession for the purpose of asserting our rights, but would regard it as sufficient for us to notify the respondents of our claim, as we have done, and that this would

especially be so when the property was changed into a money fund, and our right became at once a right to the money and not to the property. The property being changed into money the law will regard our mortgage as an assignment of the interest of Robbins & Lawrence in the money, and nothing can be necessary in such a case beyond making demand.

5. We say further, that whether our mortgage is to be regarded as covering the property or not, yet as the respondents have taken it under their mortgage and by their possession have brought it legally within their mortgage, they are bound to apply it upon their mortgage debt, and so far to reduce the incumbrance on the property which has precedence of ours. It is mortgaged property, and no part of the real estate, upon the security of which the respondents claim to have made their outside advances. It can be applied only to the mortgage debt, and so far will necessarily relieve us.

FOURTH. The claim of the respondents upon the British Government for certain damages, set up by way of offset. This claim we contend can not be brought in, in the present suit. It is clearly a claim for a tort, as it can not be pretended that the capricious and wrongful acts of the agents of the British government were in violation of any contract which the government had made. These acts too were done, not against the respondents themselves, but against Robbins & Lawrence, who stood in no contract relation to the British government, and the respondents were affected only indirectly, by the inability of Robbins & Lawrence, in consequence of these acts, to furnish the rifles to them in season for the demands of their own contract with the British government. As to the destruction of property by the viewers, this was clearly a tort. And the forfeiture of the $25,950, was, as is admitted, in exact accordance with the contract, only it is claimed that, if Robbins & Lawrence had not been delayed in the manufacture of the rifles, they would have been delivered to the respondents in season for their seasonable delivery by the respondents to the British government, and thus the forfeiture would have been saved. This is altogether too remote a cause for such an effect as the loss by the forfeiture ; but,

whether it be so or not, the loss, which was in precise accordance with the contract, is to be regarded entirely as damage caused by a tort, and not as a breach of contract. Regarding the claim therefore as one founded on a tort, we say:—1st. That it is an attempt to set off *unliquidated damages*, which can not be done in law or equity. All that the respondents could have done was to get a judgment at law against us and set that off. 2d. That it is peculiarly a matter which the British government has a right to try before a jury, and which a court of equity can not take jurisdiction of. This right is constitutional. 3d. That it is no reply to our objection to say that a court of equity may take jurisdiction of matters proper in themselves for an action at law where set up in defense to a bill in equity, for this rule applies only to cases where the legal matter thus set up is in itself a proper defense to the matter set up by the petition, is germane to it, grows out of it, and is so far involved in it that the petitioner, in going into chancery, will be deemed to have submitted himself to the chancery jurisdiction in the principal matter. Here the claim in question was in no manner involved in, or even related to, the matter of the petition, but was as foreign to it as would be a claim for a seizure by the British government of a cargo of Sharps' rifles in the Crimea, under the supposition that they were Russian property. In other words, the claim is set up here *by way of set-off wholly*, and not under any pretense of relation to the subject-matter of the petition. It is claimed *that he who seeks equity must do equity*. But the equity which a petitioner is thus required to do, is always an equity relating to the particular matter of the petition, and affecting the right which he himself asserts. 4th. If it be said that the British goverment is a foreign corporation, and beyond the jurisdiction of this court, and therefore can not be sued here, we reply: We have property here that can be attached,— property found by the committee to be of the value of $60,000, (double the claim,)—and 'had it before we brought our petition. 5th. If it be then said that the British government is a sovereign, and therefore not liable to an action anywhere, we reply:—If not liable to be sued at home, yet it would be liable,

we conceive, to a suit here, in any case where there is property to attach to give jurisdiction, or where service of a writ is accepted, *and where the cause of action relates to the government, not in its sovereign capacity, but in its capacity as a mere property-holding or contracting corporation.* This distinction is everywhere recognized and is very important. It is thus that the state of Connecticut holds lands in Ohio,— merely as a corporation, not as a sovereign. Can it be that there is no mode of bringing a question of title to those lands before an Ohio court? Or if a foreign government should invest funds in stocks here, and a question should arise as to the title to the stocks, is it possible that there would be no means of bringing the question into our courts? And can it be that our courts would sustain a right in these respondents to set off a claim against the British government, (which is a mere cross action,) and yet would not enable them to reach by suit the same funds if they happened to be held by some other party and not by themselves? But the authorities, while not decisive upon this point, seem to indicate that suits against a sovereignty can be sustained. *Mexico* v. *De Arangoiz*, 11 Howard Prac. R., 1. Com. Dig. *Prerogative D.*, 82, 90. Vattel, book 2, ch. 14, §§ 213, 214. *Calvin's case*, 7 Coke, 15. 2 Maddock Cha. Prac., 184. But further, as the British government, in these wrongful acts, was not acting in its sovereign capacity, the agents of the government, by whom personally these acts were done, were individually liable, and might have been sued every time they did a wrongful act. And there is no evidence that they were not pecuniarily responsible, so that the presumption is that they were. And especially it will be presumed that the British government would at once have satisfied any judgment against these agents, and not have left them to suffer personally. Further, so far as these unlawful acts were connected with and grew out of the contract, (and especially if, as claimed, they constitute a breach of the contract,) the defendants knew, when they entered into the contract with the British government, that they were dealing with a foreign corporation, and a sovereign corporation, and that their attempt to obtain redress

would be attended with all the embarrassments, if any, that now exist. So that they are not placed in a worse position than they expected, and are entitled to no special equities for any such reason. 6th. The case (in this respect) does not stand any better for the respondents that the property *has been converted into money*, and that we are seeking, not *literally to redeem mortgaged property*, *but to draw money out of the respondents' hands*. Our petition was brought while the property remained in specie, and we ought not to stand any the worse for the change. But suppose that our rights are affected by the change, and that we are to be treated as if demanding, in an action at law, the balance of the money left after the payment of their mortgage debt. Yet, their defense would be merely an attempt to *set off unliquidated damages*. It is a *set-off*, not a *defense ;* and a set-off of damages wholly unliquidated, and caused by a tort. Such damages could not be set off in an action at law.

*Baldwin* and *L. F. Robinson,* with whom was *Cone,* for the respondents.

FIRST. The relation of the respondents and of Robbins & Lawrence to the armory property.

By the contract of January 9, 1852, and the conveyance under it, the respondents obtained a complete legal title to the premises. The transaction was in good faith, and there was no resulting trust in favor of Robbins & Lawrence, or of any person taking under them. They had no option to redeem it, and therefore no equitable *estate* in it. They retained, however, a clear relation to the property, growing out of the *condition* upon which the legal title was transferred to the respondents. The condition was a future *payment* for the property at an appraised value. This condition was enforced by an agreement to reconvey, if the respondents did not see fit to keep and pay for the property. It was clearly therefore a *conditional sale. Chambers* v. *Hise,* 2 Dev. & Batt. Eq., 305. The legal title was parted with, so that the only *right* retained by Robbins & Lawrence was the right to payment, or, if that condition was not complied with, the right to a reconveyance.

In favor of this agreement to pay or convey, chancery, and chancery only, raised a *trust* in the land itself, as between the parties; a bare charge upon it; a naked equity, not amounting to a lien even, as there was no present right to hold the property. The equity of Robbins & Lawrence is founded solely on the respondents' agreement and is co-extensive with it. As the property, now claimed to be redeemable by the petitioner, was in fact taken by the respondents, who propose to pay for it, the agreement to reconvey has become inoperative as a security. The equity, therefore, under which subsequent rights now in controversy accrued, turns out practically *to consist only in our agreement to pay for the land.* The legal and equitable estate has become fully vested in us; it is simply charged, for chancery purposes alone, with Robbins & Lawrence's right to be repaid the *value* of the property. This naked equity was disposed of by Robbins & Lawrence to parties whose rights are now in issue.

This equity—the right to compensation for the property with its accompanying trusts—was first vested in *us,* by virtue of the contract of January 9, 1852, as a security for the performance by Robbins & Lawrence of their agreement to furnish us with twenty thousand arms. That instrument gives us the right, whether we contemplate the purchase of the property or not, or whether we pay for it or not, to retain our title to the property until that agreement is performed. This right would seem to make the clearest case of a *lien,* which is a right to retain another's property as a security. *Ex parte Heywood,* 2 *Rose B. C.,* 355. The terms "lien," "mortgage," &c., are rarely used in contracts expressly framed to create such incumbrances. The ordinary formula of the law is to grant a title or a right of possession, with a condition that it shall be "*reconveyed,*" when a certain act or duty is performed by the· grantor. *Flagg* v. *Mann,* 2 Sumner, 486, 499, 531, 543.

It is said that the creation of a security for advances could not have been intended by the parties, because the contract itself provides that security, that is, other security, shall be given for certain stipulated advances. We reply:—1st. The con-

tract lien was not designed to secure advances as such, because no farther advances were contemplated. It was to secure the manufacture and delivery of the arms. The advances which are in fact secured are not such as we stipulated to make, but such as have been forced from us by the *breach* of the contract. 2d. It was perfectly natural for the respondents to want *other* security for the contemplated advances, so long as the land pledged to the repayment of them by the contract was of very little value, not having then been built upon. 3d. There is no intimation in the contract that the security to be given was that which was given, a mortgage of Robbins & Lawrence's equitable interest in the same land.

Inasmuch as the contract lien (of 9th January, 1852,) secured the performance of the agreement of Robbins & Lawrence to manufacture arms, we claim that it secured all *damages* arising from the breach of the contract. They agreed *" to furnish all the necessary stock for, and to manufacture "* *these arms;* which is equivalent to an agreement to complete the contract in these particulars at their own expense and not at ours. They became embarassed and unable to do this without our aid, and we were forced, in order to save to ourselves the benefit of the contract, to make ourselves the advances, which we now claim to be secured by the contract lien, for the manufacture of the arms. As they were forced from us, and made solely in consequence of the breach of *one* stipulation in the contract, in order to save, if possible, the benefit of *other* stipulations, we claim that they stand upon the same ground as they would if they had been advances made originally as a consideration for the contract or made by us in fulfillment of its express terms. If they had been expenditures made to third persons to save the benefit of the stipulations of the contract, they would have clearly been damages arising from its breach. *Miller* v. *Mariners' Church,* 7 Greenl., 51. The same principle would embrace expenditures of which the other contracting party received the benefit. Where the plaintiff shows, in an action on an executory agreement, that he has by compulsion done the defendant's duty for him, he has a right to an indemnity by way of damages under the contract. *Orr* v. *Bigelow,* 4

Kern., 556. Whatever conflict exists elsewhere on this subject, it has been long settled in Connecticut that the money paid in consideration of such an agreement may be recovered back. *Bush* v. *Canfield*, 2 Conn., 485. This law has been said to be peculiar to us, but it is sanctioned by the opinion of the English Court of Exchequer. *Startup* v. *Cortazzi*, 2 C. M. & R., 165. Mayne on Damages, 86. We say further, that under the contract of January 9, 1852, we are entitled in equity to a lien for these advances, as equitable *allowances* in our favor, for expenses incurred in faith of the security and with a view to reduce our claim upon it, with a view to make the interest of the other parties to it more beneficial to them. They were made to enable Robbins & Lawrence to perform their contract; and, as their duty was charged upon the security, the performance of it would have discharged the security from the incumbrance for the benefit of all concerned. Expenditures made by an incumbrancer in good faith, which are designed and have a tendency to diminish the incumbrance, or to benefit the security, become a lien upon it in favor of the party making them. *Colyer* v. *Clay*, 7 Beav., 188, 195. *Burridge* v. *Row*, 1 Y. & C., 583. *Shaw* v. *Simpson*, id., 732. *Ex parte Hodgson*, 1 Glyn. & Jam. 13. *Ex parte Linden*, 1 Mont., D. & DeG., 428. And this, although the expenditures are incurred through mistake, and therefore without any *implied* assent even of the other party. *Ludlow* v. *Grayall*, 11 Price, 58. *West* v. *Reid*, 2 Hare, 249, 258. These principles are enforced with the greatest rigor against parties seeking to avail themselves of the right, recognized nowhere but in chancery, to redeem mortgaged property. Our own court has required the practice of the most liberal equity in cases of parties bringing suits for redemption. *Chamberlin* v. *Thomson*, 10 Conn., 251. *Scripture* v. *Johnson*, 8 Conn., 211, 213. If the exact circumstances of the present case have never existed in any of the reported precedents, courts will determine a redemption suit according to their own views of what is morally just and right. Denio, J., in *Micklen* v. *Dillaye*, 17 N. York, 83.

But our relation to the armory property is founded, not

only on the contract of 1852, and the mortgage of 1853, but on the agreement of December 11, 1855. This agreement enlarges the time within which the respondents are to elect to take the property, and authorizes them to retain it until thirty days *after " the payment of all indebtedness"* of Robbins & Lawrence. It is said this gives no lien for the indebtedness. But it obviously gives us the right to keep the legal title until that indebtedness is paid. This will fully answer our purpose, whether we have a lien thereby or not. The only serious question which can be made is, whether it secures *future* advances. We claim that its fair import is, to cover all indebtedness which shall be found to exist when Robbins & Lawrence require of us payment for the property or a reconveyance of it. Such also would seem to be its legal construction. *Adams* v. *Wheeler*, 10 Pick., 199.

SECOND. The Robbins & Lawrence Company mortgage, and the relation of the mortgagees to the armory property.

Although conveyed by a recorded mortgage, the interest acquired by the Robbins & Lawrence Company was nothing but a second assignment of a chose in action, secured by a charge on land. They were not grantees of an estate in land, but of a bare equity.

The assignee of an equity purchases at his peril. *Shirras* v. *Caig*, 7 Cranch, 48. *Norrish* v. *Marshall*, 5 Mad. Cha. R., 475. *Matthews* v. *Wallwyn*, 4 Ves., 118. And whether he receives it with or without notice of prior equities which affect it, he is subject to them all. He takes the same position as his assignor. *Holbrook* v. *Worcester Bank*, 2 Curtis, 249. *Cockell* v. *Taylor*, 15 Eng. L. & Eq., 101. *Mangles* v. *Dixon*, 18 id., 82. *Stocks* v. *Dobson*, 19 id., 9. *Brandon* v. *Brandon*, 39 id., 188. The right of set-off is an equity between the original parties to which an assignee's rights are always subordinate. 1 Hilliard on Mortgages, Ch. 18, § 50 *a.* If the contract of January, 1852, secured our advances as against Robbins & Lawrence, either as damages or allowances under that security, it is equally effectual against their assignee, the Vermont corporation, without reference to the question of set-off.

The contract also secured, as against the assignee, advances made after the assignment. If the right to make voluntary advances on the credit of a security is stayed by the *bona fide* assignment of the security, yet the right to make advances *necessary to protect the contract secured*, can not be impaired by the intervention of a new owner of the equity. Such a right is itself a continuing equity, inherent in the contract and binding the security while the contract remains unperformed. At all events, the rights of the first assignee of a security are never affected by a subsequent assignment until he has notice of it. *Stocks* v. *Dobson*, supra. *Tassell* v. *Smith*, 2 De Gex & Jones, 713. *Rolt* v. *Hopkinson*, 3 id., 177.

But, it is said, that constructive notice is sufficient to render us accountable to the second assignee. The authorities assert a contrary doctrine. Registration is notice only where registration is necessary. When it is a duty, the law makes it operative in favor of the party who has performed the duty. *Nelson's Heirs* v. *Boyce*, 7 J. J. Marshall, 401. *Williams* v. *Birbeck*, Hoff. Cha., 359. *James* v. *Morey*, 2 Cow., 246. *Adair* v. *Adair*, 5 Mich., 211. *Blake* v. *Graham*, 6 Ohio S. R., 580. *Cheney* v. *Watkins*, 1 Harr. & Johns., 527. *Reed* v. *Marble*, 10 Paige, 409. *Reed* v. *Coale*, 4 Ind., 283. The statutes of registration apply only to conveyances and mortgages of land; not to mere equities. It is said that the statutes should be so construed as to have an equitable operation against those who know of the existence of such trusts, and that they ought to be charged with constructive notice through a record confessedly of no effect against a stranger. But this would be judicial legislation. Moreover, these statutes are not administered on equitable principles. A record of an imperfect deed—good in equity as a covenant— is not constructive notice, even in equity, of the existence of such an equitable interest. *Brown* v. *Lunt*, 37 Maine, 423.

But before our relations to the equity assigned to us by Robbins & Lawrence could be changed by actual notice of their second assignment, the subsequent assignees of that mortgage, Fox, Henderson & Co., knowing of the contract of January 1852, and knowing of the extent of the assignors'

liabilities to us, became parties to an arrangement, by which our lien was not only recognized, but fortified by an express renewal and extension.

Even if, however, the Robbins & Lawrence Company by their mortgage acquired certain rights which can be asserted against us, they and those who hold their mortgage have no interest in the machinery and stock procured after the date of that mortgage. A considerable part of the machinery bought by us, and all the stock and materials which we took, were procured after the date of that mortgage. The clause in the mortgage which purported to create a security on chattels to be acquired afterwards, was totally void for that purpose. *Pierce* v. *Emery*, 32 N. Hamp., 484. *Levy* v. *Welch*, 2 Edw. Ch., 438. *Winslow* v. *Merchants' Ins. Co.*, 4 Met., 306. *Barnard* v. *Eaton*, 2 Cush., 295. *Mitchell* v. *Winslow*, 2 Story R., 636. *Chapin* v. *Cram*, 40 Maine, 561. *Milliman* v. *Neher*, 20 Barb., 37. *Hope* v. *Hayley*, 34 Eng. L. & Eq., 189. *Hamilton* v. *Rogers*, 8 Maryl., 301. *Findlay* v. *Toncray*, 2 Robinson, (Va.) 374. *Garden* v. *Ingram*, 23 Eng. L. & Eq., 408. *Coe, Trustee* v. *Pennock*, 6 Am. Law Reg., 27. Even in cases where such a provision in a chattel mortgage is good in equity as an agreement to assign, *it creates no trust in the property.* *Otis* v. *Sill*, 8 Barb., 102. Even if the goods were supplied to replace others in existence at the time of the mortgage, they are in no sense accessory to the property embraced in the instrument. They are not incident to it or incorporated with it. Mere substitution is not accession. *Holly* v. *Brown*, 14 Conn., 255. *Tapfield* v. *Hillman*, 6 Scott, N. S., 967.

THIRD. The succession of Fox, Henderson & Co. to the Vermont corporation, and the effect of their acts upon our rights.

The transfer of the Robbins & Lawrence Company's interest in the equity in question to Fox, Henderson & Co. (who, like the petitioner Rowan, may be considered for the purposes of the case as identical with the British government,) was made under an arrangement to which we were parties, and by which we acquired direct rights against the transferee.

Robbins & Lawrence were sub-contractors to and stockholders in the Vermont corporation, and were therefore willing to be its sureties. To obtain from them security for the indebtedness of the corporation to Fox, Henderson & Co., an understanding was entered into, of which the four different parties were at least cognizant, that we should release a part of our land; that it should be first mortgaged to secure a definite contract-liability of the corporation to Fox, Henderson & Co., and then mortgaged to us, to secure the mortgagors' indebtedness to us, independent of any prior lien; that our contract lien should be extended so as to embrace all indebtedness which should exist at the time when we should pay for the armory property; and, that the entire estate, as soon as the obligation secured by the mortgage to Fox, Henderson & Co. was fulfilled, should be restored to us just as we held it before. Knowing that, in faith of this arrangement only, we made the release, that our only design was thereby to provide them with a security upon it, Fox, Henderson & Co. accepted the security. Knowing also of the agreement for the extension of our contract lien upon the entire premises, they received a transfer of the Robbins & Lawrence Company mortgage, over which our lien had priority except as to the property released. This extended contract lien they are bound to respect, to the same extent as Robbins & Lawrence themselves or the Vermont corporation would be; for they are mere successors to the former's equity, not *bona fide* purchasers of a security. Accordingly, if the import of the extension-contract is to cover future advances, as we claim that it clearly is, they take Robbins & Lawrence's interest charged with that trust in our favor. They assent that we shall have a lien for such advances.

FOURTH. The set-off of our independent claim.

If we are liable to the petitioner for a portion of the redemption fund, we have a counter demand which chancery will set off against it. 1st. For the sum unjustly withheld from us by the British government as damages for the non-performance of our contract with them, when the breach was occasioned by the misconduct of the government agents. 2d. For the dama-

ges consequent upon the wanton interference of its agents with Robbins & Lawrence's contract with us. 3d. For their trespass in destroying property which we were compelled to replace.

The injury to us, through the wanton interference of the government agents with the performance of Robbins & Lawrence's contract with us, was a legal and actionable injury. Although an injury so brought home is not ordinarily actionable, ( *Conn. Mutual Life Ins. Co.* v. *N. Y. & N. H. R. R. Co.*, 25 Conn., 265 ; *Portman* v. *Middleton*, 4 C. B., 327,) yet if the injury was foreseen by the wrong doer, it was in law a willful violation of our rights, and a legal wrong. *Conn. Mutual Life Ins. Co.* v. *N. Y. & N. H. R. R. Co.*, supra, 276.

Such demands would clearly be the subject of set-off at law. And in equity, where good ground exists for the allowance of a counter-demand against a plaintiff, such as the prevention of fraud or irreparable injustice thereby, chancery emancipates itself from legal restrictions and adjusts counter-claims according to conscience and equitable necessity. Babington on Set-off, 166, 169. *Ld. Cawdor* v. *Lewis*, 1 Y. & C., 427. *Jones* v. *Moore*, 4 id., 351. To effect this, it overlooks, if necessary, the parties on the record, and treats the persons beneficially concerned as the real parties, for the purpose of enforcing the conscientious remedy. *Jones* v. *Mossop*, 3 Hare, 568. *Holmes* v. *Tutton*, 32 Eng. L. & Eq., 258. *Farebrother* v. *Welchman*, 24 L. Jour., 410. *Graves* v. *Hull*, 27 Miss., 423. This has been permitted at law. *Bottomly* v. *Brook*, cited 1 T. R., 535. And in such a case equity will override mere legal rules as to the nature of the demands to be set-off, and adjust claims not strictly mutual. *James* v. *Kynnier*, 5 Ves., 108. *Lord Lanesborough* v. *Jones*, 1 P. Wms., 325. *Dale* v. *Cooke*, 4 Johns. Ch., 11, 14. Or which are not strictly debts ; such as claims for unliquidated damages. *Beasley* v. *Darcy*, 2 Sch. & Lef., 403, *n.* *Jones* v. *Moore*, 4 Y. & C., 351. Mayne on Damages, 61. Our claim for the sum withheld by the government is a debt. The parties have made it so by liquidating it. Stipulated damages may always be set-off. *Fletcher* v. *Dyche*, 2 T. R., 32. *Gunn's Adm'r* v. *Todd*, 21 Mo., 303. *Hutchinson* v. *Sidney*, 28 Eng. L. & Eq., 472.

The equitable motive which leads courts of chancery to allow a set-off where the law will not, is the prevention of the fraud and injustice which would otherwise result when the holder of the counter claim has no appropriate legal remedy, or any other mode of recovering satisfaction for it. Hence the insolvency of the plaintiff, or the immunity of his person or property by absence from the jurisdiction, or both combined, have supported such set-offs in equity. *Pond* v. *Smith*, 4 Conn., 302. Story Eq. Jur., §§ 1435, 1436, 1437. *Gay* v. *Gay*, 10 Paige, 369. *Bonaud* v. *Sorrell*, 21 Geo., 108. *Dale* v. *Cook*, supra. Courts will always interpose to enforce a set-off when *justice can not be obtained by a cross action. Lindsay* v. *Jackson*, 2 Paige, 581, and cases there cited. Bristol, J., in *Pond* v. *Smith*, 4 Conn., 302. Walworth, Chancellor, in *Tone* v. *Brace*, 8 Paige, 600. *Bernard* v. *Trustees of Gallatin Seminary*, 3 J. J. Marsh., 427.

In the present case, we have no remedy by cross action against the real plaintiff; being a recognized foreign sovereignty against whom no suit can be sustained. Vattel, book 4, chap. 7, § 108. *Duke of Brunswick* v. *King of Hanover*, 6 Beav., 1. *King of Spain* v. *Hullet*, 1 Cl. & Fin., 333. *Rothschild* v. *Queen of Portugal*, 3 Y. & C., 594. There is no power to enforce judgment against foreign sovereigns without an act of war. 1 Beav., 48, 49. Westlake on International Law, 115. They are not subjects of our law, and, being always in legal theory beyond our territorial confines, are never within its jurisdiction. There is no difficulty, however, in holding them responsible for a cross demand, when they voluntarily appear as suitors in our own courts, in their own name or by agents. This has been emphatically and repeatedly settled in England. By bringing suit they submit to the jurisdiction. *Rothschild* v. *Queen of Portugal*, 3 Y. & C., 594. *Columbian Govt.* v. *Rothschild*, 1 Sim., 94. *Duke of Brunswick* v. *King of Hanover*, 6 Beav., 1, 37. *King of Spain* v. *Hullet*, 1 Dow. & Cl., 169. *S. C.*, 1 Cl. & Fin., 333. *S. C.*, 7 Bligh, 359, 387, 392, 393.

ELLSWORTH, J. The facts in this case are exceedingly nu-

merous and complicated, and give rise to several interesting questions of law, which have been discussed with learning and ability.

In view of the character and pecuniary importance of the cause, we have kept it under consideration for several weeks, but we find, after a careful examination of it, and a full consultation, that our views are essentially, if not entirely harmonious. If they differ at all, the disagreement is not such as to affect the result, as we had severally arrived at the same conclusion.

The petitioner, Henry S. Rowan, who represents the British government, seeks to redeem certain mortgaged premises described in his petition. His title is derived from a mortgage given by Robbins & Lawrence to the Robbins & Lawrence company, a Vermont corporation, dated December 9th, 1854. This mortgage was given to secure a note of $75,000, given by Robbins & Lawrence for an indebtedness to the corporation, which note, with the mortgage, has been assigned for value by the corporation to Fox, Henderson & Co., and by them to the petitioner.

The premises are sought to be redeemed from the respondents as being mere prior mortgagees; and the questions made by the petitioner are, substantially, what is the property mortgaged, and what is the prior incumbrance of the respondents which must be paid off by the petitioner, if he redeems, or first satisfied from the mortgage fund.

The respondents make here a preliminary question, whether the petitioner has any right whatever to redeem. They deny that he has any right of redemption whatever. They say that they were the owners of the property in fee, by virtue of the contract of January 9th, 1852, and the deed of the real estate given them soon after, and that the petitioner can not redeem the property out of their hands. They say further, that if the respondents are indebted to Robbins & Lawrence in consequence of their purchase of the armory property under the contract, yet that the mortgage does not purport to assign to the mortgagees the *debt* due to Robbins & Lawrence, which

Rowan *v.* Sharps' Rifle Manufacturing Company.

is not even alluded to in the mortgage, but only the specific property itself. The petitioner on the contrary insists that, if the property is to be regarded as having been conditionally sold to the respondents, yet, as his mortgage was taken before the respondents elected to become the absolute owners of it, and while Robbins & Lawrence had an interest in it, he can in equity treat the debt, after the respondents have taken the property, as he could have treated the property itself if they had elected not to take it, and can call on the respondents to pay him any balance which they owe to Robbins & Lawrence, for the property which they have so taken, beyond the amount of their prior lien.

We have not thought it important to examine this question with particular care, because, even if the petitioner's claim is correct, he has not shown that there is a balance due from the respondents, to be paid to any one.

In our view the petitioner is clothed only with the rights of an assignee of Robbins & Lawrence, and can stand only in their place as to the debt in controversy. The Robbins & Lawrence Company, by their mortgage of the 9th of December, 1854, obviously took only what Robbins & Lawrence could convey to them as their own. The public records showed that the title to the real estate had never been vested in them, nor does it appear that they had, at any time, even an equity in the real estate, except in an event which has never yet happened. The premises were fully vested in the respondents. They are found by the committee to have been owners in fee from the time of the original purchase, and to have taken the title directly from the persons of whom the land was purchased, and soon after the execution of the contract of January 9th, 1852, and it did not appear from the public records that there was any condition whatever attaching to their title, or any equity whatever in favor of Robbins & Lawrence. Nor was there, in fact, any equity in their favor, except what may be gathered from the contract of January 9, 1852. We must therefore examine that contract, (and perhaps the later contracts of November 9th, and December 11th, 1855, in determining the final rights of the parties,) to see what was the

equity in Robbins & Lawrence which they mortgaged to the Robbins & Lawrence Company, and which, by successive assignments of the mortgage, has come into the hands of the present petitioner. That is the only equity which we can consider in this cause, either as to the property in its original form, or as to the fund which is supposed to stand in its place. The questions then are, what is the amount of that fund?— and to what liens or deductions is it subject, upon a final settlement between the respondents and Robbins & Lawrence. We shall therefore treat this bill as if brought by Robbins & Lawrence to obtain a legal title to the real estate from the respondents, considering them as trustees of the property, or to obtain an account of the money, regarding it as a fund.

We would remark, however, that in considering the question with regard to the relative rights of the parties throughout the case, the personal property covered by the mortgage of Robbins & Lawrence to the respondents, and by the later mortgage to the Robbins & Lawrence Company, now held by the petitioner, may, with the exception of certain machinery and stock subsequently purchased and described in both mortgages as after acquired property, and of which we shall speak more particularly hereafter, be wholly laid out of the case. The whole of the personal property, not including the stock, is found to amount to only $59,174, while the mortgage debt of the respondents is much larger. It is obvious that they may equitably first apply the whole of this fund to their mortgage debt, leaving the real estate alone to be the subject of controversy. The petitioner can not complain that the property mortgaged to the respondents, and which was mortgaged to him expressly subject to that mortgage, should be applied to the payment of the respondents' mortgage debt; while, as we shall endeavor to show, the respondents have a claim on the real estate, founded upon the contract of January 9, 1852, and the legal title vested in them under the provisions of that contract, which is not only superior to the title of the petitioner, but is independent of, and superior to, the title conveyed by their own mortgage of September 1853. Considering then the real estate as really alone in controversy here, (except the

stock, which stands on peculiar ground and will be considered by itself hereafter,) we return to the course of argument which we were pursuing.

By the contract of the 9th of January, 1852, the respondents are not obliged to release the property of which they took the legal title until the contract was fully performed by Robbins & Lawrence. This event has never happened. Of the twenty thousand rifles which they were to manufacture and deliver under that contract, they are deficient in the number delivered to the extent of three thousand and eighty. They were also deficient, at the time of their failure, in the number of arms to be delivered under the contract of November 9, 1855, having delivered but two thousand nine hundred of the six thousand five hundred which they contracted to deliver. And by the contract of December 11, 1855, known as the extension contract, the respondents are not required to elect whether to take the property or to release it, not only until the contracts of January 9, 1852 and November 9, 1855 are performed, but until "*all indebtedness*" of Robbins & Lawrence to them is paid; and this event has not taken place.

But not to dwell on these partial failures, there are yet other and more important defaults and omissions on the part of Robbins & Lawrence, which stand in the way of their right to a release of the property, or to the payment of any part of the fund in the hands of the respondents. In no just sense have Robbins & Lawrence bought land for an armory, as stipulated, for the respondents; or erected buildings and supplied them with machinery and tools adequate to the manufacture of ten thousand rifles annually; or purchased stock and manufactured twenty thousand rifles, which they were to do by the first day of January, 1855; but, on the contrary, they became embarrassed at an early period of the business, and at last failed and abandoned both their contracts. Under their embarrassments, being unable to go on, they had called upon the respondents, "*urgently*" as is found, to render them assistance, to enable them to perform their first contract, and afterwards that of November 9, 1855. And the respondents did assist them, by advancing money towards the purchase of

the land and the erection of the buildings, and the equipping of the armory with machinery and tools, as well as for procuring stock, materials and work, and other things requisite for the performance of the contracts. The amount so advanced, in addition to the advances secured by the mortgage of September 22, 1853, is found to be $75,772.40; all of which, we think, is an equitable, if not a legal lien on the property, as to Robbins & Lawrence and those who represent them, and ought to be repaid to the respondents before they are deprived of the property, or of the fund which is substituted for it. Indeed, the course pursued by the parties was little else than the respondents paying for all the property, real and personal, as well as for the arms, in advance. We regard them as having taken the legal title to the property, that it might not, under any circumstances, become embarrassed or involved with any mortgage to other parties, either in form or in effect. We may well assume that they insisted upon the absolute title at the outset for this very purpose, and that, having such a title, they were willing to advance their money in the manner in which they did, towards building up and equipping what was really *their armory*, and for the manufacture of the arms for themselves; holding in one hand, to a great extent, what they paid out with the other. Whatever was advanced that was not directly for the armory and its equipments, was advanced to promote and secure, equally directly, the performance of the contracts of January 1852 and November 1855; the latter of which, as well as the extension contract of December 11th, 1855, though entered into after the date of the petitioner's mortgage, were yet, if the fact be of any importance, entered into before the respondents had knowledge of that mortgage. In our judgment the respondents had a clear right to charge upon the property these advancements towards the completion of their contracts and the perfecting of their title; at all events, the advancements were an equitable offset against any claim of Robbins & Lawrence for the value of the property, as if the respondents had been factorized as the debtors of Robbins & Lawrence, in which case this equity would be very clear. So, we are confident,

the parties themselves understood it at the time, and nothing, was further from their thoughts than that these large sums were being advanced without security, or that the respondents had not a perfect security in the absolute legal title which they held to the armory. For what other purpose, we may well ask, did the respondents take and hold such a title? We repeat, that they believed themselves to be already the purchasers of the armory, and that they were to remain so unless they changed their minds and elected to release it; and in that case, Robbins & Lawrence were, by their contract of December 11th, 1855, to first pay all their indebtedness to them. This is the equitable view of the matter certainly, and no court under such circumstances would decree that the re- spondents should surrender their title to Robbins & Lawrence, or their assignees, until such indebtedness was paid.

This view would seem to be correct on the further ground, which was urged by the respondents' counsel, and in support of which numerous authorities were read, that whatever the respondents *were compelled by their position to do*, or in fair- ness might do, to assist Robbins & Lawrence in the perform- ance of their contracts, by advancing money to prevent the damages which would result from the non-performance, may be an equitable charge upon the property or the fund, espe- cially if the advancements were made at the request of Rob- bins & Lawrence. A case so circumstanced belongs to the class of cases in which a trustee or mortgagee who has ad- vanced money to protect the property from injury or loss, is held to have a good charge upon the property for the money so advanced. The authorities say that such payments are ex- penses incurred in faith of the security, with a view to make the interest of the other party more beneficial to him; and it is even said that the necessity for these expenditures may be so palpable, that an omission to make them may subject the trustee or mortgagee for neglect of duty. It appears to us to be equitable, as a general rule, that where the expenses have been incurred in good faith, and were designed and have a tendency to diminish the incumbrance, or otherwise to benefit the security, they should be held to be a good charge upon the

property. *Colyer* v. *Clay*, 7 Beav., 188. *Burridge* v. *Row*, 1 Younge & Coll., 583. *Shaw* v. *Simpson*, id., 732. *Ex parte Hodgson*, 1 Glyn. & Jam., 13. *Ex parte Linden*, 1 Mont., D. & DeG., 428. *Ludlow* v. *Grayall*, 11 Price, 58. *West* v. *Reid*, 2 Hare, 249.

It is a general doctrine of equity, familiar to us all, that a petitioner asking for equity must first do equity; and so far has this doctrine been carried, that, in England certainly, it is well established that a mortgagor who seeks to redeem the property from the mortgagee, may be required to pay, not only the mortgage debt, but debts secured by other mortgages, if they have become due. In the case of *Phelps* v. *Ellsworth*, 3 Day, 397, the old Court of Errors applied the rule to the case of a mortgagee seeking a foreclosure, and obliged the mortgagor to pay a debt secured on other lands, as a condition of redemption. The general doctrine is sustained by all the authorities. 1 Story Eq. Jur., § 64. *Walling* v. *Aiken*, 1 McMullen Eq., 2, 14. 1 Mad. Cha., 424. 2 Cruise Dig., tit. 15, Cha. 3, § 35. 1 Lead. Cases in Eq., 429, *et seq. Mergrave* v. *LeHooke*, 2 Vern. 207. *Pope* v. *Onslow*, id., 286. *Reason* v. *Sacheverell*, 1 Vern., 41. *Jones* v. *Smith*, 2 Ves. Jr., 372. American decisions, both of our own and our sister states, sustain the general principle laid down in the case of *Phelps* v. *Ellsworth*. *Scripture* v. *Johnson*, 3 Conn., 211. *Chamberlin* v. *Thompson*, 10 id., 251. *Lampson* v. *Sutherland*, 13 Verm., 309. *Budgden* v. *Carhartt*, 1 Hopk. Cha., 234. *Townsend* v. *Empire Stone Dressing Co.*, 6 Duer, 208.

If this equitable doctrine is to be applied to this case, as we think it must, at least in its spirit, it puts an end to all claim of Robbins & Lawrence and their assignees to the property in question, or the pecuniary fund which represents it, until they pay to the respondents, or allow them out of the fund, in addition to their mortgage debt, this sum of $75,772.40.

But it is said that these moneys were not advanced, certainly not all of them, before the mortgage under which the petitioner claims was executed. That mortgage was executed on the 9th day of December, 1854, and was immediately after

recorded.    But it is found that the respondents had no actual knowledge of this mortgage until December 11th, 1855, and no notice of it except what the law would infer from its being recorded.    We think the law would not infer notice from the record, and that they were not obliged to take notice of the record.    They had themselves the entire title, and so the records declared to the whole world.    Having bought the property fairly, although with the right to give it up if they pleased and on certain conditions, no one had a right to complain of the state of their title or of their transactions with regard to the property, if all was fair on their part, as the fact is proved to have been.    Certainly the respondents were under no obligation to know that others were meddling with their property, or to inquire after any such fact, knowing, as they did, that their right was perfect in itself, and must take precedence of all other rights, which might be acquired by other parties, if any such could be supposed.    They had, we repeat, a right to remain silent and inactive.    The rule of law certainly is that a purchaser is not bound to take notice of a deed which is subsequent to his own, unless he seeks to obtain some new and further interest than his deed already gives him.

But if some of the advancements were made after the 11th day of December, 1855, when the respondents received actual notice of the mortgage under which the petitioner claims, we do not see that it would make any difference, nor that it would alter the case if all the advancements were made after that date.    We regard all these advances as authorized by the contract of January 9, 1852, or by that of December 11, 1855, extending the lien upon the property to the contract of November 9, 1855, and to all the indebtedness of Robbins & Lawrence.    So far as the first of these contracts is concerned, the respondents might continue to make all necessary advances to prevent the failure of Robbins & Lawrence to perform the contract and the damage to the whole property from such failure, even after actual notice of the petitioner's mortgage. This necessarily results from the principles which we have already discussed.    We are much inclined to think this con-

tract alone sufficient to authorize all the advances. But as to the contract of December 11, 1855, it is found that Fox, Henderson & Co. when they took their assignment of the mortgage knew of that contract, as well as of all the other contracts between the parties, and also of the advances which the respondents had been and were making to Robbins & Lawrence, and we are inclined to think that they, as well as the Robbins & Lawrence Company, the original mortgagees, who with Robbins & Lawrence and Fox, Henderson & Co. solicited from the respondents the arrangement under which a part of the property was released so that it might be mortgaged to Fox, Henderson & Co., may be regarded as having, in that negotiation and transaction, assented to the extension of the lien of the respondents over the property retained by them, by the contract of that date. But however this may be they certainly acted with full notice. The very arms which Robbins & Lawrence were to manufacture for the respondents, under the contract of November 9, 1855, were to go to the British government, and Fox, Henderson & Co. were under no misapprehension as to the past and continued necessity under which Robbins & Lawrence labored, of advances from the respondents to enable them to perform their contracts. They were acquainted with the situation of things at the time, and no deception of any kind was practiced upon them. In the circumstances they can not complain if the respondents insist upon their rights under the contract of December 1855, while, independently of that contract, the respondents have an equitable lien on the property for all advances, whenever made, that were necessary to secure the performance of the contract of January 9, 1852, and for all advances to assist Robbins & Lawrence to perform the contract of November 9, 1855, or for any other purpose whatever, which were made before they received actual notice of the petitioner's mortgage, on the 11th day of December, 1855.

It is very manifest that the respondents had already become deeply committed in behalf of Robbins & Lawrence, and were obliged to go forward or take the ruinous consequences. Further advancements were necessary to enable them to complete their contracts and to prevent a failure that would be

disastrous, not merely to Robbins & Lawrence and themselves, but to the whole property. The necessity was still further increased by the large contract into which the respondents had entered with the British government for the manufacture of rifles, and for their ability to perform which they were dependent upon the manufacture by Robbins & Lawrence. They could not stop the works without an injury to all parties and interests that would be essentially irreparable. Under these circumstances it is clear that, if the respondents are to be treated as merely prior incumbrancers, they must be regarded as having the continued right to make these advances even after notice of the petitioner's mortgage, and that, we think, under their original contract and within the fair scope and effect of their original incumbrance. It was held by this court that a prior mortgagee might make such advances on the security of the property, in the kindred case of *Crane* v. *Deming*, 7 Conn., 388, which is a case of advancements made after subsequent mortgages had been made and put upon record. If, as we are inclined to think, the original contract and the legal title held by the respondents were sufficient to authorize all the advances made by them, the contract of December 11th, 1855 might be laid entirely out of the case, and we should thus avoid any question as to the effect of the knowledge of that contract upon the Robbins & Lawrence Company and upon Fox, Henderson & Co., and all question as to the effect upon the respondents of their knowledge, acquired at the same time with that transaction, of the mortgage under which the petitioner now claims.

Applying then these principles, and stating the account between the respondents and Robbins & Lawrence or the property, at what result do we arrive? Allowing the respondents to be properly charged with the value of the whole armory property, including the stock, of which we will speak presently, they are accountable for a fund, amounting as found by the committee to . . . $147,241.32
From this it is agreed that the mortgage debt of the respondents is to
  be taken, amounting to, . $71,610.30
Add to this the advancements in
  question, . . . 75,772.40  $147,382.70

Thus it appears that nothing is due from the respondents to Robbins & Lawrence, and therefore, upon the principles which we have laid down, nothing to the petitioner ; and this, if we are correct in our views, makes an end of the case, without the necessity of examining several other questions which were considered as involved in the case and discussed on the argu ment. One of these, with regard to the stock and other personal property purchased after the execution of both mortgages, we have before suggested that we should consider, and a decision of it is perhaps to some extent involved in our general conclusion, while there are one or two other points on which, as they were elaborately argued, and have been considered by us, though not so fully as if we had found it necessary to a disposal of the case, we think it proper to express our views.

And first, as to the personal property brought into the armory after the execution of the mortgages, and taken by the respondents in their final purchase of the entire property. This property consists mainly of the stock, valued at $41,-478.21. If covered at all by the mortgages, it is by force of the following clause, which is substantially the same in both :—— " And all the machinery, tools, stock manufactured and in process of manufacture, fuel and personal estate, in said factory buildings, or which may be therein during the continuance of this mortgage." We have, in stating the account, made the respondents chargeable with the value of the whole property taken by them, including the property now in question. It was taken by them and used for their own benefit with the rest of the property, and they are clearly liable to account for it. But we all think that the petitioner is entitled to have this sum applied to enlarge the general fund in his favor. There is, in any view, a debt for that amount, for so much property delivered to and received by the respondents, with the other property specifically described in the mortgage ; and whether the respondents did or did not acquire a title thereto by their mortgage, we need not decide. We all agree that the stock did not pass *in presenti*, as it was not then *in esse*, but we think it was sufficiently described in the mortgage, so that when afterwards purchased and placed in the building,

and actually delivered to and accepted by the respondents, there was then a sufficient meeting of the minds of the parties to pass a title as if under the mortgage, according to the decision of this court in the case of *Calkins* v. *Lockwood*, 17 Conn., 154. We do not see however that this can affect the result, since no interest passed in this stock by the provisions of the petitioner's mortgage. That mortgage embraced it only as property to be acquired in future, and as no title passed *in presenti* and the petitioner never took actual possession so as to give effect to the mortgage, he does not stand in relation to it as a second mortgagee, but has merely an equitable right that the respondents, as first mortgagees, having turned the stock into money, should apply it in payment of their mortgage debt. If this were all, such an application would accrue to the benefit of the petitioner, by releasing some portion of the mortgaged property covered by his mortgage, which he could then apply to his mortgage debt. But the respondents stand, by virtue of their contract of January 9, 1852, and of their advances made under it and not covered by their mortgage, in as equitable a position, in relation to this stock, as the petitioner himself does. Indeed, as this stock was purchased with the very money which the respondents advanced to aid Robbins & Lawrence, and was placed on the premises of which they held the legal title, they had, independent of the mortgage, at least an equitable lien upon it for the money advanced for its purchase, and they may well be regarded as having taken possession of it both under this lien and under their mortgage. However this may be, we regard them as liable to account for it and to apply it in reduction of their claim, and as we regard their whole claim as taking precedence of the petitioner's, they are thus applying it for the benefit of the petitioner.

The respondents claimed upon the argument, that, if there was any balance in their hands to which the petitioner was entitled, they had a right to set-off against the claim, a large claim which they had against the British government, for whose benefit confessedly the petitioner was suing, consisting in part of the sum of $25,950, besides some interest upon it,

found to have been " retained " by the British government to satisfy a penalty of $5 for each rifle undelivered by the respondents within a certain time, within which by their contract with the British government the respondents were to deliver them, but which were afterwards delivered, and in part of the sum of $2,570.18 for the value of property destroyed or injured by the agents of the British government in inspecting the rifles manufactured under the contract—besides a further sum for loss sustained from delay in the payment for the guns, caused by the delay of the delivery. As before suggested, we need not decide this question, but we can see no good reason why the respondents should not be allowed the amount retained by the British government as a forfeiture, since it is found by the committee that the delay arose entirely from the interference of the agents of the British government, in changing the orders from time to time with regard to the form of the arms and the work upon them, while in the progress of manufacture. We think it is inequitable for the British government to withhold this sum. We regard the claim as essentially founded on contract, and since the British government is here asking for equity, and seeking to draw money out of the hands of the respondents, we think that this claim, however it may be with regard to the others, may properly be set-off against its demand.

And we think that this may be done, although the British government, as a foreign sovereignty, may not be liable to be sued in our courts, as we are inclined to think that it is not, since it is here asking for the interposition of the court, and has voluntarily come under our jurisdiction.

For these reasons we advise the dismissal of the bill.

In this opinion the other judges concurred.

Advice that bill be dismissed.